# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

In Re:

**CHARMING CASTLE, LLC,**                                    BK 06-71420
**d/b/a INDIES HOUSE,**

     **Debtor.**

**ROBERT A. MORGAN, TRUSTEE**

     **Plaintiff,**

**v.**

**ROYAL MANUFACTURED HOMES,**                               AP 08-70007
**LLC.**

     **Defendant.**

## <u>MEMORANDUM OPINION</u>

This adversary proceeding came before the court on August 11, 2010 and August 30, 2010, for trial on Robert A. Morgan, Trustee's ("Trustee") Complaint. (AP Doc. 1). The Complaint seeks the recovery of money that Royal Manufactured Homes, LLC ("Defendant") allegedly owes to Charming Castle, LLC, d/b/a Indies House ("Debtor"). David B. Anderson and Deanna L. Weidner appeared on behalf of Trustee; Ted Stuckenschneider appeared on behalf of Defendant. After consideration of the evidence submitted at trial and the arguments of the parties this court finds that Trustee is entitled to judgment in the amount of $323,382.80.

## JURISDICTION

The Bankruptcy Court has jurisdiction of this case pursuant to 28 U.S.C. § 1334(a). This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

1

Jurisdiction is referred to the bankruptcy courts by the General Order of Reference of the United States District Court for the Northern District of Alabama, signed July 16, 1984, as Amended July 17, 1984.

## FINDINGS OF FACT

Debtor filed a voluntary petition under Chapter 11 of Title 11 on October 5, 2006. (Bk. Doc. 1). Debtor voluntarily converted the case to one under Chapter 7 of Title 11 on December 11, 2006. (Bk. Doc. 102). Robert A. Morgan was appointed trustee of Debtor's Chapter 7 estate on December 12, 2006. (Bk. Doc. 104).

Prior to filing this bankruptcy petition, Debtor was a manufacturer of mobile homes, operating two manufacturing plants, one in Haleyville, Alabama and the other in Hackleburg, Alabama. Defendant, Royal Manufactured Homes, is a mobile home dealer that operates in Opelousas, Louisiana.[1] Debtor and Defendant regularly did business with one another. (Plaintiff's

---

[1]Danny Richard, the sole member of Defendant, testified on behalf of Defendant at the trial. He has been in the mobile home business for over 30 years and has worked as a mobile home salesman, a mobile home mover, and a mobile home installer. He has never worked in mobile home manufacturing. Danny Richard also owns Danny Richard Mobile Movers ("Mobile Movers"), which is a mobile home moving company. If Mobile Movers moved a home, sometimes they would do the grading on the site where the mobile home was to be delivered. If Mobile Movers did not do the grading, then Danny Richard would verify that it was done correctly before the mobile home was installed on the site. Mobile Movers would sometimes place the mobile home on a slab. Once the site on which the mobile home was to be installed was ready, Mobile Movers would assemble the mobile home based upon the manufacturer's requirements. In order to line up the two halves of the mobile home when installing the mobile home on site, Mobile Movers would use a hydraulic system. Sometimes the mobile home would have to be racked, which means that one half of the mobile half would have to be jacked up in order to level the mobile home. Danny Richard testified that half of the mobile home would have to be jacked up a maximum of a few inches. Once a mobile home is installed on site, settling can occur. The settling of the mobile home can cause doors to be crooked, cracks in ceilings and walls, etc. Mobile Movers also does repairs on mobile homes; there are some repairmen on staff, but Mobile Movers also contracts out work. Mobile Movers would invoice Defendant for any work done and Defendant would write a check to Mobile Movers. Danny

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 2 of 61

Exhibit 66). Danny Richard ("Richard"), the sole member of Defendant, testified that Terry Oliver, a representative of Debtor, solicited the business of Defendant in Louisiana. After the business relationship was established, Richard went to Alabama to see the homes that Debtor had on display. Richard further testified that he went to Alabama twice over the course of his dealing with Debtor and that usually Debtor would send a representative once a year to solicit sales. Debtor and Defendant did not enter into a written contract; instead, Defendant and Debtor made oral contracts on a per home basis.[2] Richard testified that he had to constantly negotiate with Debtor about service and that the order of a manufactured home from Debtor could depend upon an agreement by Debtor to provide service to a manufactured home that was previously purchased. Defendant regularly carried homes manufactured by Debtor at his dealership.

In the normal course of business, Defendant would fax a spec sheet for a manufactured home to a manufacturer; the manufacturer would fax back a price to manufacture the home; and if the parties agreed, Defendant would tell the manufacturer to start manufacturing the home.[3] Once the home was manufactured, it would then be delivered to Defendant's lot. Upon delivery, the manufactured homes were rarely inspected. Richard testified that the manufactured homes were not inspected for two reasons: First, Richard testified that in order to catch all potential defects, the two halves of the home would have to be put together. Once the two halves were put together, they

---

Richard would determine the price to be paid by Defendant.

[2]This is a standard arrangement in the mobile home industry.

[3]Defendant had a floor plan with St. Landry's Bank. St. Landry's required a floor plan authorization letter from the manufacturer before it would lend money to Defendant. Phillip Wilson, the company representative of Debtor, testified that Debtor would not start production until it received confirmation from the floor plan lender that there were available funds.

3

would have to be taken apart so that they could be moved and delivered to any future purchaser. Second, Richard testified that the weathering placed on the manufactured home before it was delivered to Defendant, prevented any inspection of the home. Weathering involves stapling heavy-duty plastic over the open portions of the home so that the home is not exposed to the elements during transport.[4] Richard further testified that he instructed the employees of Defendant to write down any issues that could be seen without a full inspection. After a home was delivered, it would generally sit on Defendant's lot for a period of time.[5]

This controversy centers around 5 manufactured homes that were manufactured by Debtor and came into the possession of Defendant. Richard testified that he, acting on behalf of Defendant, agreed to pay for these manufactured homes on the condition that Debtor deliver quality products and catch up on the backlog of service requests.[6] Richard further testified that the 5 manufactured

---

[4] Upon questioning, Richard admitted that it was not expensive to repair the plastic weathering, but continued to insist that it was difficult to replace and repair. Because repairing or replacing the weathering mainly involves stapling the heavy-duty plastic, it is very doubtful that aggressive weathering prevented Defendant's employees from inspecting the manufactured homes that were delivered.

[5] On some occasions, when Defendant ordered a manufactured home from Debtor, Defendant did not have a purchaser for the home. Therefore, the home would sit on Defendant's lot until someone purchased the home. Some of these homes would be available for potential purchasers to view. When the homes sat on Defendant's lot, the only protection afforded the home from the elements was the weathering placed on the home during transport.

[6] Richard testified that there were service issues and product line issues with the homes manufactured by Debtor. Richard further testified that a large backlog of service requests began to accumulate in 2006. When it became clear to Defendant that Debtor was not going to fix all of the problems with the homes, Defendant began refusing to make payments on homes previously delivered until the service issues were resolved. Jackie Fowler, who formerly worked as a parts coordinator/part-time service coordinator for Debtor, testified that the quality of the manufactured homes went down during his seven-year tenure there, particularly the quality of the hinge roofs on the manufactured homes. Wilson, the company representative of Debtor, vehemently denied that this was the case. Although Wilson testified that the quality of the homes

4

homes which were delivered were defective and that Debtor did not catchup on the backlog of service requests. As a result, Defendant is seeking a reduction in the purchase price of the 5 manufactured homes and recoupment of costs associated with the failure of Debtor to service previously delivered manufactured homes. Defendant never rejected or revoked acceptance of a home manufactured by Debtor.

### UNIT 6160 (Arceneaux/Nezat)

Defendant, through its owner Danny Richard, ordered the manufacture of Model M-032 S/N AL 3264-I06-6160 AB ("Unit 6160") from Debtor on December 2, 2005 through an Order Acknowledgment and Production Order.[7] (Plaintiff's Exhibit 66). The Order Acknowledgment and Production Order indicates that the price to manufacture Unit 6160 was $54,049.00. (Plaintiff's Exhibit 1 & 3). Unit 6160 was manufactured on May 5, 2006, and was shipped to the Defendant on the same day. (Plaintiff's Exhibits 4 & 8). The Bill of Lading indicates that Defendant received the manufactured home on May 8, 2006. (Plaintiff's Exhibit 8 & 9). Bernadine Nezat purchased Unit 6160 from Defendant on December 12, 2006 for $115,450.00. (Plaintiff's Exhibit 12). Defendant received a check for $102,198.75 on February 9, 2007 in payment for Unit 6160.[8] Defendant has

---

Debtor manufactured did not deteriorate and that the quality of the homes was on par with other manufacturers, he did admit that some homes suffered damage during transit and that there were numerous complaints that the homes were not coming together properly at the marriage wall. In addition, Wilson admitted that Defendant had a large backlog of service requests. Debtor shut down manufactured operations in June of 2006 due to cash flow problems. At the time Debtor shut down, there were hundreds of back service orders. Although some service people and the foreman were kept on staff, Debtor did not make service calls in July/August of 2006.

[7]The Order Acknowledgment and Production Form shows that the mobile home was ordered for a customer named Arceneaux. Danny Richard testified that there was no customer and that a name was just made up for tracking purposes.

[8]Bernandine Nezat made a down payment of $6,450.00. (Plaintiff's Exhibit 12).

made no payment to Debtor for Unit 6160 and is unaware of its location at this time.

Defendant alleges that Unit 6160 was defective when it was delivered and that Defendant is entitled to a reduction in the purchase price. In support of this allegation, Defendant submitted the following invoices detailing the cost of repairs to Unit 6160:

| Date of Invoice | Defect | Cost to Repair |
|---|---|---|
| 11/21/2006 | Wood flooring | $2,945.69 |
| 12/13/2006 | Repair electrical circuits | $426.65 |
| 12/22/2006 | Remove and replace flooring | $1,758.00 |
| 12/26/2006 | Electrical Repairs | $1,650.00 |
| 01/22/2007 | Repairs to floors | $750.00 |
| 03/06/2007 | Repairs to water line in master shower | $334.18 |
| 03/12/2007 | Replace 18 sheets of Sheetrock | $6,000.00 |
| Undated | Repair roof and replace exhaust vents | $238.42 |
|  |  |  |
|  | Total | $14,102.94 |

(Defendant's Exhibit 2).[9] The Bill of Lading for Unit 6160 indicates that there were "interior [and] exterior issues" with the first half of the unit upon delivery and that the second half could not be

---

[9]Defendant alleged the same defects and cost of repairs in its Answers to Plaintiff's Request for Admission and Interrogatories. (Plaintiff's Exhibit 66).

6

inspected.[10]  (Plaintiff's Exhibit 8 & 9).  The Bill of Lading also indicates that there was no driver damage.

## UNIT 6161 (Boudreaux/Jolivette)

Defendant, through its owner Danny Richard, ordered the manufacture of Model M-032 S/N AL 3264-I06-6161 AB ("Unit 6161") from Debtor on December 2, 2005 through an Order Acknowledgment and Production Order.[11]  (Plaintiff's Exhibit 66).  The Order Acknowledgment and Production Order indicates that the price to manufacture Unit 6161 was $53,331.00.  (Plaintiff's Exhibit 15 & 18).  Unit 6161 was manufactured on May 1, 2006, and was shipped to Defendant the same day.  (Plaintiff's Exhibits 17 & 21).  The Bill of Lading shows that Defendant received the manufactured home on May 2, 2006. (Plaintiff's Exhibit 21).  Theresa Jolivette purchased Unit 6161 from Defendant in August, 2007 for $109,300.00.  (Plaintiff's Exhibit 24 and Defendant's Exhibit 2).  Defendant received a check for $74,395.22 on November 7, 2007 in payment for Unit 6161.[12] (Plaintiff's Exhibit 25).  Defendant has made no payment to Debtor for Unit 6161 and is unaware of its location at this time.  (Plaintiff's Exhibit 66).

Defendant alleges that Unit 6161 was defective when it was delivered and that Defendant is

---

[10]As noted above, the employees of Defendant rarely did a full inspection, but they were instructed to note any visible issues with the home.  Richard testified that the interior issues could have been noticed by an employee after they looked in through a window or went in through a door.

[11]The Order Acknowledgment and Production Order shows that the mobile home was ordered for a customer named Boudreaux.  Danny Richard testified that this name was probably made up.

[12]Theresa Jolivette made a down payment of $15,000.00 and received a land credit of $20,000.00.  (Plaintiff's Exhibit 24).  This is why the check received in payment for Unit 6161 was substantially less than the purchase price.

7

entitled to a reduction in the purchase price.  In support of this allegation, Defendant submitted the

following invoices detailing the cost of repairs to Unit 6161:

| Date of Invoice | Defect | Cost to Repair |
|---|---|---|
| 08/23/2007 | Replace 4 wall boards; clean and change moldings | $534.54 |
| 9/13/2007 | Repair ceiling cracks | $187.19 |
| 09/14/2007 | Replace 9 wallboards | $800.00 |
| 10/12/2007 | Repair roof and replace exhaust vent | $360.59 |
| 10/30/2007 | Re-stretch carpet | $155.00 |
| 11/08/2007 | Home inspection | $170.00 |
| 11/17/2007 | Troubleshoot and replace faulty wire | $247.70 |
| | | |
| | Total | $2455.02 |

(Defendant's Exhibit 2).[13]  The Bill of Lading for Unit 6161 indicates that there were "interior [and]

exterior issues" with both halves of the unit upon delivery.  (Plaintiff's Exhibit 21).  The Bill of

Lading also indicates that there was no driver damage.  (Plaintiff's Exhibit 21).

### UNIT 6202 (Jackson/Courville)

---

[13]Defendant alleged the same defects and cost of repairs in its Answers to Plaintiff's Request for Admission and Interrogatories with two exceptions.  (Plaintiff's Exhibit 66).  First, in its Answers, Defendant stated that it spent $800.00 to replace the fire alarms in Unit 6161; however the invoice shows that Defendant spent $800.00 to replace 9 wallboards in Unit 6161. Second, in its Answers, Defendant stated that it spent $534.54 to replace 4 wallboards in Unit 6202; however, the invoice shows that the repair was actually made to Unit 6161. (Plaintiff's Exhibit 66).

Defendant, through its owner Danny Richard, ordered the manufacture of Model M-032 S/N AL 3264-I06-6202 AB ("Unit 6202") from Debtor on December 2, 2005 through an Order Acknowledgment and Production Order. (Plaintiff's Exhibit 27). The Order Acknowledgment and Production Order indicates that the price to manufacture Unit 6202 was $54,216.00. (Plaintiff's Exhibit 27 & 31). Unit 6202 was manufactured on May 23, 2006, and was shipped to Defendant on the same day. (Plaintiff's Exhibits 30 & 33). The Bill of Lading indicates that Defendant received the manufactured home on May 24, 2006. (Plaintiff's Exhibit 33). Jason P. Courville purchased this unit from Defendant on March 19, 2007 for $85,100.00. Defendant received a check for $84,100.00 in payment for Unit 6202 on May 25, 2007.[14] (Plaintiff's Exhibit 36). Defendant has made no payment to Debtor for Unit 6202 and is unaware of its location at this time. (Plaintiff's Exhibit 66).

Defendant alleges that Unit 6202 was defective when it was delivered and that Defendant is entitled to a reduction in the purchase price. In support of this allegation, Defendant submitted the following invoices detailing the cost of repairs to Unit 6202:

| Date of Invoice | Defect | Cost to Repair |
| --- | --- | --- |
| 04/24/2007 | Loose wires | $164.22 |
| 05/07/2007 | Carpet had to be re-stretched | $135.00 |
| 05/10/2007 | Re-screw tape float ceiling cracks | $768.00 |
| 05/30/2007 | Remove and replace 7 wall boards | $777.98 |
| 06/18/2007 | Replace fire alarms | $154.00 |

---

[14]Plaintiff's Exhibit 27 shows this unit was ordered for a customer named Jackson, but Plaintiff's Exhibit 35 shows that this unit was sold to James P. Courville, who made a $1,000.00 down payment.

9

| | | |
|---|---|---|
| 06/20/2007 | Repair two ceiling cracks | $287.34 |
| 07/17/2007 | Repair to ice maker and counter top repair | $311.39 |
| | | |
| | Total | $2,597.93 |

(Defendant's Exhibit 2).[15]   The Bill of Lading for Unit 6202 shows that there were "inside [and] outside issues" with both halves of the unit upon delivery.  (Plaintiff's Exhibit 33).  The Bill of Lading also indicates that there was no driver damage.  (Plaintiff's Exhibit 33).

## UNIT 6298 (Harris)

Defendant, through its employee Terry Thibodeaux, ordered the manufacture of Model M-028 S/N AL 3280-I06-6298 AB ("Unit 6298") from Debtor on April 7, 2006 through an Order Acknowledgment and Production Order.  (Plaintiff's Exhibit 66).  The Order Acknowledgment and Production Order indicates that the price to manufacture Unit 6298 was $78,598.00.  (Plaintiff's Exhibit 38).  Unit 6298 was manufactured on May 30, 2006, and was shipped to Defendant on the same day.  (Plaintiff's Exhibits 40 & 43).  The Bill of Lading indicates that Defendant received the manufactured home on May 31, 2006.  (Plaintiff's Exhibit 43).  Todd A. Harris purchased Unit 6298 from Defendant on June 2, 2006 for $112,000.00.  (Plaintiff's Exhibit 45).  Defendant received a check for $105,000.00 on June 2, 2006 and a check for $3,500.00 on May 7, 2007 in payment for

---

[15]Defendant alleged the same defects and cost of repairs in its Answers to Plaintiff's Request for Admission and Interrogatories with one exception.  (Plaintiff's Exhibit 66).  In its Answers, Defendant stated that it spent $534.54 to replace 4 wallboards in Unit 6202; however the invoice shows that Defendant spent $534.54 to replace 4 wallboards in Unit 6161. (Plaintiff's Exhibit 66and Defendant's Exhibit 2).

10

Unit 6298.  (Plaintiff's Exhibit 46).  Defendant has made no payment to Debtor for Unit 6298 and is unaware of its location at this time.  (Plaintiff's Exhibit 66).

Defendant alleges that Unit 6298 was defective when it was delivered and that Defendant is entitled to a reduction in the purchase price.  In support of this allegation, Defendant submitted the following invoices detailing the cost of repairs to Unit 6298:

| Date of Invoice | Defect | Cost to Repair |
|---|---|---|
| 05/17/2006 | Remove bad siding, resquare doors and windows, replace and repaint | $2,180.00 |
| 06/17/2006 | Bad wiring | $294.60 |
| 06/20/2006 | Broken sheetrock | $2,500.00 |
| 06/30/2006 | Reframe attic rafters & reset furnace | $1,356.00 |
| 07/06/2006 | Repaint | $2,800.00 |
| 07/06/2006 | Paint supplies | $188.65 |
| 08/17/2006 | AC/Diagnostic | $150.00 |
| 10/13/2006 | Duct repairs | $150.00 |
| 09/26/2007 | Stage 3-RWG inspection | $223.00 |
|  |  |  |
| Total |  | $9,842.25 |

(Defendant's Exhibit 2).[16]  The portion of the Bill of Lading for Unit 6298 where issues with the manufactured home would be detailed is illegible.  (Plaintiff's Exhibit 43).

**UNIT 6399 (Sturlese)**

Defendant, through its owner Danny Richard, ordered the manufacture of Model M-004 S/N

---

[16]Defendant alleged the same defects and cost of repairs in its Answers to Plaintiff's Request for Admission and Interrogatories with one exception.  (Plaintiff's Exhibit 66).  In its Answers, Defendant alleged it paid $550.00 for heater repairs; however, there was no invoice submitted to prove this.  (Plaintiff's Exhibit 66).

11

AL 3284-I06-6399 AB ("Unit 6399") from Debtor on April 4, 2006 through an Order Acknowledgment and Production Order. (Defendant's Exhibit 47). The Order Acknowledgment and Production Order indicates that the price to manufacture Unit 6399 was $98,445.00. (Plaintiff's Exhibit 47 & 51). Unit 6399 was manufactured on May 31, 2006. (Plaintiff's Exhibit 50). No Bill of Lading for Unit 6399 was admitted into evidence; therefore, there is no record of the exact date Defendant took possession of the manufactured home. David Sturlese purchased Unit 6399 from Defendant on March 27, 2006 for $139,900.00. (Plaintiff's Exhibit 54). Defendant received three checks in payment for Unit 6399: one for $110,000.00 on June 7, 2006; one for $15,000.00 on August 28, 2006; and one for $1,100.00 on January 25, 2007. (Plaintiff's Exhibit 55). Defendant has made no payment to Debtor for Unit 6399 and is unaware of its location at this time. (Plaintiff's Exhibit 66).

Defendant alleges that Unit 6399 was defective when it was delivered and that Defendant is entitled to a reduction in the purchase price. In support of this allegation, Defendant submitted the following invoices detailing the cost of repairs to Unit 6399:

| Date of Service | Defect | Cost to Repair |
|---|---|---|
| 06/23/2006 | Floor repair | $695.00 |
| 06/28/2006 | Reframe walls | $590.00 |
| 07/21/2006 | Reset water heaters & reframe heater compartment | $625.00 |
| 08/17/2006 | Replace broken sheetrock and rescrew wall throughout home | $1,589.00 |
| 08/20/2006 | Cleaning & paint preparation | $739.22 |
| 08/29/2006 | Repaint throughout and refinish sheetrock | $2,236.00 |

| | | |
|---|---|---|
| 09/22/2006 | Repair cabinets and water line, remove broken floor tile | $1,637.00 |
| 10/06/2006 | Repair roof at hinge line | $809.00 |
| | | |
| Total | | $8,920.22 |

(Defendant's Exhibit 2).[17]  No Bill of Lading for Unit 6399 was admitted into evidence; therefore, there is no record of what, if any, defects were present at the time Unit 6399 was delivered to Defendant's lot.  However, a Good Order Form was admitted and it has the following items checked: (1) Kitchen - the refrigerator, lights, and drapes; (2) Dining Room - chandelier; (3) Living Room - light fixtures (in box), drapes, carpet, outside light; (4) Master Bedroom - mirror, lights, curtains; (5) Front Bedroom - lights and curtains; (6) Middle Bedroom - lights and curtains; (7) Hall - furnace cover, furnace, and light; (8) Bath - commode top, tub; stopper-shower, and mirror; (9) Master Bath - commode top (under lavatory) tub; stopper-shower, and mirror; and (10) Options - blown ceiling and switch box cover.[18]  (Plaintiff's Exhibit 53).

## UNIT 5020

There is a disagreement over how and under what terms Model M-001-32 S/N AL 3280-I05-5020 AB ("Unit 5020") came into the possession of Defendant.  The Order Acknowledgment and Production Order indicates that Debtor manufactured Unit 5020 at the request of T.M.A. Homes located in Keithsville, Louisiana.  (Plaintiff's Exhibit 56).  The Order Acknowledgment and Production Order indicates that the cost to manufacture this home was $70,074.00.  (Plaintiff's

---

[17]Defendant alleged the same defects and cost of repairs in its Answers to Plaintiff's Request for Admission and Interrogatories.  (Plaintiff's Exhibit 66).

[18]Interestingly, despite the numerous checked items, the Good Order Form for Unit 6399 states that the unit could not be checked out.

Exhibit 56 & 60). Unit 5020 was delivered to T.M.A. Homes on September 24, 2004. (Plaintiff's Exhibit 61). Neither half of Unit 5020 was inspected upon its arrival at T.M.A. Homes. (Plaintiff's Exhibit 61). At some point, Unit 5020 became distressed; Debtor asked Defendant to pick up Unit 5020 and bring it to Defendant's lot. Defendant did so, and Unit 5020 has been sitting on Defendant's lot for the past two years. Defendant claims that it is still sitting on its lot because the manufactured home is good only for salvage and that Debtor never attempted to pick the unit up. (Plaintiff's Exhibit 66). Debtor claims that it is still sitting on Defendant's lot because Defendant prevented Debtor from picking the unit up.

Plaintiff filed this complaint seeking the purchase price of Unit 6160, Unit 6161, Unit 6202, Unit 6298, Unit 6399, and Unit 5020. Defendant counterclaimed, seeking a reduction of the purchase price due to defects, detailed above, that were present in the various units. In addition to the reduction of the purchased price, Defendant is also seeking recoupment for damages sustained due to the poor quality of the homes manufactured by Debtor and sold to consumers by Defendant. Specifically, Defendant is seeking the recoupment of the costs of the lawsuits that have been brought against it in Louisiana. These lawsuits allege that Defendant, as a manufactured home dealer, sold defective homes to purchasers in Louisiana; Defendant asserts that Debtor should reimburse Defendant for these costs because the defects in the homes were manufacturing defects and that, in the absence of these manufacturing defects, Defendant would not have had to defend against these lawsuits. A discussion of the nine lawsuits brought against Defendant in Louisiana follows:

### ADAMS

On January 18, 2009, Mickey and Donna Adams ("the Adams) filed a Petition for Redhibition against Defendant and Debtor in Louisiana. The Petition for Redhibition seeks to have

the sale of the mobile home rescinded because the home sold to them by Defendant was not manufactured to withstand 150 mph winds. (Defendant's Exhibit 9C). The Order Acknowledgment and Production Order shows that the Adams ordered a mobile home that could withstand wind speeds of 150 mph. The Manufacturer's Data Plate shows that the mobile home that was delivered to them could only withstand speeds of 90 mph. (Defendant's Exhibits 9A & 9B). In addition to the lawsuit filed by the Adams, Defendant was also fined by the Louisiana Manufactured Housing Commission ("Commission"). Defendant received a letter from the Commission dated May 28, 2008, stating that the office received a complaint from the Adams. The letter further stated that the mobile home "was not tied/secured to the slab. The data plate indicates that this home was built for a wind speed of 90 mph 3 second burst. Current IRC requirements for this address are 135 to 136 miles per hour. This indicates that you are in violation of selling the incorrect wind speed home and not properly installing it." (Defendant's Exhibit 9A). On July 17, 2008, the commission sent Defendant a second letter stating that an inspection had been conducted and that there were alleged violations of the "Louisiana State Uniform Code Wind Speed regulations and/or the manufacture's installation guidelines." (Defendant's Exhibit 9A). On August 8, 2008, the commission sent a third letter demanding payment of the $1,500.00 fine ($1,000 fine for wind speed violation and $500.00 fine for installation violation) assessed against Defendant for violating the Louisiana Uniformed Standard Code for Manufactured Housing. (Defendant's Exhibit 9A). The Petition for Redhibition is still pending.

## ANGONA

On July 8, 2004, Joey and Donna Angona ("the Angonas") filed a Petition for Redhibition, Breach of Contract Under the New Home Warranty Act and Damages against Defendant and Debtor

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 15 of 61

in the Parish of St. Landry in Louisiana. (Defendant's Exhibit 10B). The complaint alleges the following defects: fascia improperly installed; shingles and roofing improperly installed; vinyl siding improperly installed; doors and door stops improperly installed and caulked; ceramic improperly caulked; cracks in ceiling; walls improperly caulked; crown molding improperly installed and damaged; nail holes throughout home; sink improperly caulked; drawers do not close properly; stains on flooring; ridges in flooring; window trim improperly installed and caulked; vinyl at patio doors torn; improper installation of replacement sheet rock; and other problems. Based upon these alleged defects, the Angonas asserted that the mobile home was inherently defective and sought to have the sale of the manufactured home rescinded or, in the alternative, damages. Defendant settled this lawsuit for $3,385.60 ($185.60 in court costs) and wrote a check to "Joey & Donna Angona & Thomas Dejean" in this amount. (Defendant's Exhibit 10A).

## ASHFORD

On September 19, 2007, Kevin and Tiffany Ashford ("the Ashfords") filed a Petition for Breach of Warranty and Redhibition in the Evangeline Parish in Louisiana. (Defendant's Exhibit 11A). The complaint alleged that the mobile home was defective and sought the cost of all repairs necessary, as well as costs and attorney fees, or, in the alternative, a reduction in the purchase price, damages, costs, and attorney fees. Danny Richard testified that there was extensive sheetrock damage, that there were cabinet doors missing, and that cabinets were not centered over the window when the manufactured home was delivered to Defendant's lot. The Petition of Redhibition is still pending.

## BONAVENTURE

Robert and Mary Bonaventure ("the Bonaventures") also filed a lawsuit against Defendant.

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document      Page 16 of 61

The lawsuit was arbitrated and the arbitrator "ordered that the items listed on the '30-Day Customer Satisfaction Inspection Report' be repaired by the [Defendant] at [Defendant's] expense within 60 days from [July 3, 2007]." (Defendant's Exhibit 12A). In addition, Defendant was ordered to pay "[t]he administrative filing and case service fees of the AAA, totaling $750.00 and the fees and expenses of the arbitrator, totaling $250.00." Defendant estimates that it would cost the following to repair the alleged defects: $5,113.00 for labor and $1,075.00 for parts. (Defendant's Exhibit 12B). Danny Richard testified that the largest expenditures for the repairs were caused by the fact that the refrigerator was not properly secured during shipment.

### DAUSSAT

On October 17, 2006, Dennis Daussat, Jr. ("Daussat"), filed a Petition for Damages, Rescission, and/or Redhibition, Quanti Minoris, and Attorney Fees and/or Specific Performance Under Warranty/Contract in St. Landry Parish, Louisiana. (Defendant's Exhibit 13A). The suit alleged numerous defects including electrical problems; window defects; ceiling defects; carpet defects; interior and exterior trim defects; floor and flooring defects; cabinet and counter defects; wall defects; skirting defects; tile defects; paint defects; door defects; improper setup problems and plumbing problems; as well as additional non-apparent defects. Daussat sought the rescission of the sale of the mobile home or, in the alternative, a reduction in the purchase price. In addition to these alleged defects, Daussat also alleged that the water heater was defective. Defendant replaced the water heater for a total cost of $628.84: the replacement water heater cost $478.84 and the installation of the water heater cost $150.00. (Defendant's Exhibit 13B). In describing the condition of Daussat's manufactured home, Richard testified that he noticed the following defects: defects in the kitchen cabinets, defects in the windows that made the windows difficult to open and close,

17

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 17 of 61

defects in the doors that made the doors be out of square, and a defect in the roof which caused water to come in at the hinge line which caused mold. The Petition for Damages is still pending.

## DARBONNE

On October 20, 2006, James Dolan Darbonne ("Darbonne") filed a Petition for Damages in St. Landry Parish, Louisiana. The suit alleged defects and sought damages not to exceed $50,000.00. (Defendant's Exhibit 14A). In describing the condition of Darbonne's manufactured home, Richard testified that he noticed the following defect: defect in the roof which caused issues at the hinge line. Richard further testified that many materials were missing from the home when it was delivered, which made it impossible to finish the home after the two halves were put together. The Petition for Damages is still pending.

## EASTERLING

On December 20, 2005, Chad and Lisa Easterling ("the Easterlings") filed a Suit for Redhibition and Damages against Defendant in the Parish of Avoyelles in Louisiana. (Defendant's Exhibit 15D). The suit alleged that the manufactured home "exhibited water leaks and the trapping of excessive amounts of condensation in the interior wall, caused, upon information and belief, by improperly caulked ceiling light fixtures, holes in vent ducts, and improperly vented air conditioning coiling, causing the growth of toxic mold and causing the air conditioner unit to run excessively." The suit also alleged that the set up of the mobile home was improperly and negligently conducted. The Easterlings sought the reimbursement of all damages sustained. The Suit for Redhibition was dismissed on June 30, 2010, and the Easterlings were ordered to pay $4,806.00 in jury costs, and also taxed with all costs associated with the Suit for Redhibition. (Plaintiff's Exhibit 72). It is not clear whether the complaint filed with the Auto Fraud Unit of the Attorney General's Office of Louisiana

18

by the Easterlings has been dismissed. (Defendant's Exhibit 15A).

## MONCEAUX

Leonard Monceaux ("Monceaux") has not filed a lawsuit against Defendant, but did file a consumer complaint with the Louisiana Manufactured Housing Commission ("the Commission"). (Defendant's Exhibit 16). The complaint filed with the commission alleged the following defects: cracks in the walls, lumps in the floors, improperly installed window in the dining room, improperly installed carpets, improperly repaired cracks in the ceiling, improperly installed skirting, warped siding, problems with the marriage line, installation of improper floor and ceiling molding, and installation of incorrect carpet. (Defendant's Exhibit 16). In describing the condition of Monceaux's manufactured home, Richard testified that he noticed the following defects: lumps in the floor, crooked windows, improperly installed carpet, ceiling cracks, improperly installed skirting, and problems with the marriage line.

## POWERS

On May 30, 2006, Jerry Powers and the Estate of Ethel Elaine Powers ("the Powers") filed a Suit in Redhibition against Defendant alleging numerous defects with the home seeking rescission of the sale of the manufactured home in Evangeline Parish, Louisiana. (Defendant's Exhibit 17A).[19] The Powers were awarded $45,000.00 in an Interim Arbitration Award, but the arbitration was set aside. (Defendant's Exhibits 17D & 17H). Defendant submitted a form showing all the alleged problems in the Powers' manufactured home. (Defendant's Exhibit 17I). To fix these alleged problems would cost $6,780.00 in labor and $4,598.00 in parts. (Defendant's Exhibit 17I). In

_____

[19]The Powers were also a party to an arbitration wherein they were awarded $45,000.00 plus costs. (Defendant's Exhibit 17D). However, this arbitration award was vacated and the proceedings were remanded to the trial court. (Defendant's Exhibit 17H).

19

describing the condition of the Powers' manufactured home, Richard testified that he noticed the following defects: problems with the walls, floor, doors, cabinets, roof, and siding. The Suit in Redhibition is still pending.

## ATTORNEY FEES

Defendant is also seeking recoupment of the attorney fees associated with defending the lawsuits detailed above. Defendant produced a number of Account QuickReports to show the legal fees it has been required to pay from January 2006 through July 2010. The Account QuickReport shows that Defendant paid $31,452.38 in legal fees in 2006; $1,935.00 in legal fees in 2007, and $2,550.00 in arbitration fees in 2007; $5,607.50 in legal fees in 2008, and $8,214.83 in arbitration fees in 2008; $9,024.92 in legal fees in 2009; $2,643.40 from January 1 through July 30, 2010. (Defendant's Exhibit 3). In support of the Account QuickReports, Defendant submitted an affidavit, dated July 27, 2010, signed by a partner in the Louisiana law from of Morrow, Morrow, Ryan & Bassett. (Defendant's Exhibit 8). The Debtor objected to the admission of this Exhibit and Debtor's objection was sustained. Attached to the affidavit is Exhibit A, also dated July 27, 2010, which shows that Morrow, Morrow, Ryan & Bassett has billed Defendant a total of $74,827.47.

## LOST PROFITS

In addition to seeking the recoupment for costs associated with the lawsuits detailed above, Defendant is also seeking recoupment of lost profits. Defendant asserts that the low-quality homes manufactured by Debtor and the associated problems with the servicing of the homes led to lower revenues and profit margins for Defendant. Defendant's 2006 tax return shows gross receipts of $3.25 million and gross profit of $632,188.00. (Defendant's Exhibit 5). Defendant's 2007 tax return shows gross receipts of $895,338.00 and gross profit of $252,056.00. (Plaintiff's Exhibit 6). Danny

20

Richard attributed this drop in revenue to the problems Defendant was having getting its mobile homes serviced by Debtor. Defendant's 2008 tax returns shows gross receipts of $857,386.00 and gross profit of $108,386.00. (Plaintiff's Exhibit 7).

In summation, the Trustee sued Defendant to recover the purchase price for Unit 6160, Unit 6161, Unit 6202, Unit 6298, Unit 6399, and Unit 5020. Defendant counterclaimed, asserting that it is entitled to a reduction in the purchase price of the above-mentioned units due to manufacturing defects present in the homes. Defendant further asserted that it is entitled to recoupment of the costs it has had to incur due to manufacturing defects present in other manufactured homes ordered from Debtor. Specifically, Defendant is seeking recoupment of the costs incurred as a result of lawsuits brought against Defendant by customers who bought homes manufactured by Debtor, including attorney fees, as well as recoupment of lost profits and storage costs.

## CONCLUSIONS OF LAW

The Trustee filed this adversary proceeding to obtain a judgment for the purchase price for six manufactured homes that Debtor manufactured and that came into the possession of Defendant. Specifically, the Trustee asserts that it is entitled to a money judgment for $408,713.00, plus interest: $54,049.00 for Unit 6160; $53,331.00 for Unit 6161; $54,216.00 for Unit 6202; $78,598.00 for Unit 6298; $98,445.00 for Unit 6399; and $70,074.00 for Unit 5020. Although Richard admits that Defendant did not pay for any of the units at issue in this case, Defendant asserts that it does not owe Debtor for the units because they were manufactured in a "substandard condition that rendered them unusable and to a large extent has caused the Defendant to have to defend himself in numerous lawsuits as to their substandard condition." (AP Doc. 9). Specifically, Defendant is seeking a reduction in the purchase price of the units at issue in this case, as well as recoupment of costs it has

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 21 of 61

incurred due to the alleged manufacturing defects present in other manufactured homes ordered from Debtor.

## I. Choice of Law

There is a dispute between Trustee and Defendant about what law this court should apply in resolving this adversary proceeding: Trustee asserts that Alabama law controls the validity and construction of the contract between Debtor and Defendant while Louisiana law controls Defendant's claim for redhibition; Defendant asserts that Louisiana law controls all claims in this adversary proceeding. Because the Trustee concedes that Louisiana law applies to Defendant's claim for redhibition, the only issue here is whether Alabama or Louisiana law applies to the breach of contract claims. To resolve the dispute, this court must first determine what choice-of-law rule applies. There is a split of authority regarding whether a bankruptcy court should apply the choice-of-law rules of the state in which the bankruptcy court sits or whether the bankruptcy court should apply federal choice-of-law rules. See, e.g., Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co., Inc.), 839 F.2d 203, 205-06 (4th Cir. 1988); In re Presque Isle Apartments, L.P., 118 B.R. 332, 334 n.1 (Bankr. W.D. Penn. 1990).

The Supreme Court of the United States has held that: "In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits." Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 162, 67 S. Ct. 237, 240 (1946). Some bankruptcy courts have interpreted this ruling to mean that state procedural rules, such as a choice-of-law rule, should not be applied in bankruptcy courts. See, e.g., Limor v. Weinstein & Sutton (In re SMEC, Inc.), 161 B.R. 953, 955 (M.D. Tenn. 1993); Lindsay v. Beneficial Reinsurance Co. (In re Lindsay), 59 F. 3d 942, 948 (9th Cir. 1993) ("In federal question

22

cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules").

The Supreme Court of the United States has also held that when state law claims are brought in federal court pursuant to diversity jurisdiction, the federal court must apply the choice-of-law rules of the state in which it sits. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1022 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side."). This Klaxon rule rests "on the rationale that a federal court, in determining state law issues which arise in federal court only by the accident of diversity, must apply state law, including state conflict of law rules, to those issues." In re Merritt Dredging Co., Inc., 839 F. 2d at 205. This principle has led some courts to find that a bankruptcy court should apply the choice-of-law rules of the state in which it sits. See, e.g., Bianco v. Erkins (In re Gaston & Snow), 243 F. 3d 599, 601-02 (2nd Cir. 2001) ("Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."); Titan Cruise Lines v. Elliot (In re Titan Cruise Lines), 353 B.R. 919, 923 (Bankr. M.D. Fla. 2006) ("It is well established that suits filed in the district court based on diversity jurisdiction are governed by the law of the forum . . .and the district court must apply the conflicts rules of the forum . . . . There is no logical reason why this same rule should not apply to a suit in a bankruptcy court which is not filed to enforce any provision of the Bankruptcy Code.").

23

In short:

The question of what choice of law rules should be applied by a bankruptcy court presents another wrinkle. Although bankruptcy cases involve federal statutes and federal questions, a bankruptcy court may, as here, face situations in which the applicable federal law incorporates matters which are the subject of state law. It is clear that a federal court in such cases must apply state law to the underlying substantive state law questions. Whether a court in such a situation must apply the conflicts rule of the forum state in determining *which* state's law to apply or may choose the applicable state law as a matter of independent federal judgment, however, has remained an open question.

In re Merritt Dredging Co., Inc., 839 F. 2d at 205-06. Luckily, in order to determine which choice of law rule to apply, this court does not have to reach a decision on this difficult issue. This is true because both Alabama choice-of-law rules and federal choice-of-law rules dictate that Louisiana law be applied to the breach of contract claims brought in this adversary proceeding.

"Alabama law follows the traditional conflict-of-law principles of *lex loci contractus* . . . ."

Lifestar Response of Alabama, Inc. v. Admiral Ins. Co., 17 So. 3d 200, 213 (Ala. 2009) . "Under the principles of *lex loci contractus*, a contract is governed by the law of the jurisdiction within which the contract is made." Id. The evidence admitted in this case indicates that Defendant would initiate an order for a manufactured home in Louisiana by faxing a spec sheet to Debtor; Debtor would fax back a price to manufacture the home; if the price was agreeable, Defendant would instruct Debtor to start manufacturing the home. Essentially, the offer to manufacture a particular home for a particular price was sent to Louisiana by Debtor, and Defendant would either accept or reject the offer in Louisiana. Based upon this, the contracts at issue in this case were made in Louisiana. Therefore, if this court were to apply Alabama choice-of-law rules, Louisiana law would apply to the breach of contract claims brought in this adversary proceeding.

Federal common-law conflict-of-laws rules dictate that the Restatement (Second) of Conflict of Laws should determine which conflict-of-laws rules should be applied to a particular case.

24

<u>Piamba Cortes v. American Airlines, Inc.</u>, 177 F. 3d 1272, 1296 n.19 (11th Cir. 1999). The

Restatement (Second) of Conflict of Laws provides: "The measure of recovery for a breach of

contract is determined by the local law of the state selected by application of the rules of §§ 187-

188." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 207 (1971). Section 187 of the Restatement

(Second) applies when the parties have made an effective choice regarding the law that will apply

to the contract. <u>Id</u>. at § 187. That is not the case here. Therefore, § 188 of the Restatement (Second)

applies. Section 188 provides:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by
> the local law of the state which, with respect to that issue, has the most significant
> relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be
> taken into account in applying the principles of § 6 to determine the law applicable to an
> issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business
>> of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the
> particular issue.
>
> (3) If the place of negotiating the contract and the place of performance are in the same state,
> the local law of this state will usually be applied, except as otherwise provided in §§ 189-199
> and 203.

<u>Id</u>. at § 188. As discussed above, the first factor favors Louisiana as the place of contracting was

Louisiana. The second factor doesn't favor either forum: The contract was negotiated in both

Alabama and Louisiana because the parties mainly communicated via phone and facsimile. The

third factor favors Louisiana: The manufactured homes were delivered to Louisiana; therefore,

Louisiana was the place of performance. The fourth factor doesn't favor either forum: The

manufactured homes, the subject matter of the contract, were manufactured in Alabama, but were delivered and set-up in Louisiana. The fifth factor doesn't favor either forum: The domicile, residence, nationality, place of incorporation and place of business of Debtor is Alabama while the domicile, residence, nationality, place of incorporation and place of business of Defendant is Louisiana. Taking all of this into consideration, Louisiana has the most significant relationship to the transaction and Louisiana law would apply to the breach of contract claims pursuant to the Restatement (Second) Conflicts of Law. Therefore, Louisiana law would apply to the breach of contract claims brought in this adversary proceeding if this court applied the federal choice-of-law rules.

Because the parties agree that Louisiana law applies to the claims for redhibition and both Alabama and federal choice-of-law rules dictate that Louisiana law applies to the breach of contract claims, Louisiana law applies to all claims brought in this adversary proceeding.

II.  Plaintiff's Claim - Breach of Contract

The Trustee commenced this cause of action to seek damages for breach of contract for six manufactured homes. Defendant ordered and received delivery of five of these manufactured homes. There is a dispute as to how Defendant came into possession of the sixth manufactured home.

**UNIT 6160**

The first manufactured home at issue is Unit 6160 which was ordered by Defendant on December 2, 2005 for the purchase price of $54,049.00. Debtor manufactured Unit 6160 on May 5, 2006 and shipped it Defendant on the same day. Defendant received the unit on May 8, 2006. Defendant sold Unit 6160 to Bernadette Nezat on December 12, 2006 for $115,450.00. Subject to offset and claimed damages, Defendant owes Debtor $54,049.00 for the manufacture of Unit 6160.

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 26 of 61

**UNIT 6161**

The second manufactured home at issue is Unit 6161 which was ordered by Defendant on December 2, 2005 for the purchase price of $53,331.00. Debtor manufactured Unit 6161 on May 1, 2006 and shipped it to Defendant on the same day. Defendant received the unit on May 2, 2006. Defendant sold Unit 6161 to Theresa Jolivette on June 30, 2007 for $109,300.00. Subject to offset and claimed damages, Defendant owes Debtor $53,331.00 for the manufacture of Unit 6161.

**UNIT 6202**

The third manufactured home at issue is Unit 6202 which was ordered by Defendant on December 2, 2005 for the purchase price of $54,216.00. Debtor manufactured Unit 6202 on May 23, 2006 and shipped it to Defendant on the same day. Defendant received the unit on May 24, 2006. Defendant sold Unit 6202 to Jason Courville on March 19, 2007 for $85,100.00. Subject to offset and claimed damages, Defendant owes Debtor $54,216.00 for the manufacture of Unit 6202.

**UNIT 6298**

The fourth manufactured home at issue is Unit 6298 which was ordered by Defendant on April 7, 2006 for the purchase price of $78,598.00. Debtor manufactured Unit 6298 on May 30, 2006 and shipped it to Defendant on the same day. Defendant received the unit on May 31, 2006. Defendant sold Unit 6298 to Todd A. Harris on June 2, 2006 for $112,000.00. Subject to offset and damages, Defendant owes Debtor $78,598.00 for the manufacture of Unit 6298.

**UNIT 6399**

The fifth manufactured home at issue is Unit 6399 which was ordered by Defendant on April 4, 2006 for the purchase price of $98,445.00. Defendant manufactured Unit 6399 on May 31, 2006 and shipped it to Defendant. Defendant received Unit 6399 shortly thereafter. Defendant sold Unit

27

6399 to David Sturlese on March 27, 2006 for $139,900.00. Subject to offset and damages, Defendant owes Debtor $98,445.00 for the manufacture of Unit 6399.

### UNIT 5020

The sixth mobile home at issue is Unit 5020. There is a disagreement over how and under what terms Unit 5020 came into the possession of Defendant. Defendant did not order Unit 5020 - it was ordered by and delivered to T.M.A. Homes in Keithsville, Louisiana. Unit 5020 was a "distressed home," meaning that it was foreclosed on or about to be foreclosed on, when Debtor asked Defendant to go pick the unit up. Debtor's representative testified that there was some discussion of Defendant purchasing the distressed unit and that the parties agreed that if Defendant wanted to purchase Unit 5020 the parties would agree on a price. The representative further testified that the parties did not come to an agreement, and that Defendant prevented Debtor from picking up the manufactured home. Defendant asserts that the manufactured home was picked up as salvage and denies that it owes Debtor any money for this unit. This court finds Defendant's account of events more credible and finds that Trustee failed to meet its burden of showing that Defendant owes any money for Unit 5020; this court is not willing to find Defendant liable for a mobile home that it did not order and did not agree to purchase. As such, Defendant does not owe Debtor any money for Unit 5020.

Based upon the preceding discussion, Defendant owes Debtor $338,639.00 subject to any applicable offset and damages.

### II. Defendant's Counterclaim - Redhibition

Defendant is seeking a reduction in the purchase price of Unit 6160, Unit 6161, Unit 6202, Unit 6298, and Unit 6399. Defendant asserts that it is entitled to reduction in the purchase price

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 28 of 61

because each of the aforementioned units had manufacturing defects.[20]  Such assertion is based upon

the Louisiana cause of action titled redhibition.[21]  Louisiana law provides that "[t]he seller warrants

the buyer against redhibitory defects, or vices, in the thing sold." LA. CIV. CODE ANN. 2520 (1995).

Louisiana law further provides:

> A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
>
> A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price.  The existence of such a defect limits the right of a buyer to a reduction of the price.

Id.  Essentially, a purchaser is entitled to a reduction in price for any defects in the purchased item.

"The buyer may prove the defect by direct evidence or by circumstantial evidence which gives rise

to a reasonable inference that the defect existed.  The defect must be proved more probably than not

by a preponderance of the evidence." Beth Israel v. Bartley, Inc., 579 So. 2d 1066, 1070 (La. App.

---

[20]Although Defendant sold the units at issue for a profit, Defendant is still entitled to seek a reduction in the purchase price from Debtor.  Gustin v. Shows, 377 So. 2d 1325, 1328 (La. App. 1 Cir. 1979) ("Jurisprudence holding that a vendee may maintain an action for Quanti minoris against the vendor even where the vendee has resold the property for a profit is of very long standing.").

[21]Defendant also seeks rescission of some of the sales.  Louisiana law provides: "A buyer who obtains rescission because of a redhibitory defect is bound to return the thing to the seller . . . ."  LA. CIV. CODE ANN. art. 2532 (1995).  See also Brown & AL. v. Duplantier, 1 Mart.(n.s.) 312 (La. 1823); Fly v. Allstar Ford Lincoln Mercury, Inc., 690 So. 2d 759, 762 (La. Ct. App. 1st Cir. 1996) ("In this case, since the vehicle could no longer be returned to the seller, the trial court ruled rescission of the sale would be inappropriate and, were any defect found, [Plaintiff's] recovery would be limited to a reduction in purchase price and recovery of expenses, including attorney fees.  This ruling was correct."); Gustin, 377 So. 2d at 1328 ("To rescind a sale, the vendee must have ownership of the purchased property or its return to the vendor would be impossible.").  Defendant no longer has possession of the manufactured homes at issue; therefore, the homes cannot be returned to Debtor and Defendant is not entitled to rescission.

29

4th Cir. 1991).

In addition to proving the existence of defects in the thing sold, a claimant must also prove the defects existed at the time of delivery: "The warranty against redhibitory defects covers only defects that exist at the time of delivery." LA. CIV. CODE ANN. art. 2530 (1995).[22] There is very little evidence concerning the condition of the five mobile homes at the time of delivery. The only evidence admitted that dealt with the conditions of the manufactured homes upon delivery were the Bills of Lading. The Bills of Lading do not offer any real guidance as they all say either "inside [and] outside issues," "interior [and] exterior issues," that the manufactured home could not be checked out, or are illegible. In addition, Richard testified that it was not common practice to inspect the manufactured homes upon delivery. Without having inspected the manufactured homes upon delivery, Defendant cannot say with certainty that defects existed at the time such homes were delivered. However, this does not necessarily mean that Defendant loses in its bid to reduce the purchase price of the five manufactured homes at issue because pursuant to Louisiana law: "[I]n the absence of other explanations, later appearing defects may be *inferred* to have preexisted the sale, when such defects do not usually result from ordinary use." Griffin v. Coleman Oldsmobile, Inc., 424 So. 2d 1116, 1118 (La. Ct. App. 1st Cir. 1982). This court will examine whether it can infer the existence of defects at the time of delivery for each manufactured home.

### UNIT 6160

Unit 6160 was delivered to Defendant on May 8, 2006 and was sold by Defendant on

---

[22]Section 2530 of the Louisiana Code further provides: "The defect shall be presumed to have existed at the time of delivery if it appears within three days from that time." LA. CIV. CODE ANN. art. 2530 (1995). This presumption is not applicable in this case.

30

December 12, 2006.[23]  Defendant alleged various defects, and testified that those defects were the result of manufacturing errors.  Plaintiff's Exhibits 8 and 9 reflect that the two houses in this unit were received by the Defendant May 8, 2006.  These exhibits reflect that there were "interior and exterior issues" on one half of the unit and "could not check out house" on the other half.  According to the invoices Defendant provided, the various defects were fixed between November of 2006 and March of 2007.  The Defendant's invoices reflect that the repairs consisted of work on sheet rock and flooring issues, electrical issues, plumbing issues, and roof issues.  Unit 6160 sat on Defendant's lot for at least six months before the first defect was fixed, and there is no telling what happened during this time period, especially considering that the home was not being cooled during the hot, humid summer.  The defects set forth in the invoices related to floor and sheet rock issues could be the result of damage that the manufactured home sustained while it sat on Defendant's lot, damage that the manufactured home sustained while it was being delivered and installed, or damage that the manufactured home sustained during settling.  This court is not prepared to infer that these defects were present in the manufactured home upon delivery.

The repairs relating to electrical, plumbing and roof repairs would not appear to be subject to the same issues concerning the length of time the mobile home was on the Defendant's lot and the installation of the mobile home.  The court is prepared to infer that these defects existed at the time unit 6160 was delivered to the Defendant.

_____

[23]Occasionally, when Defendant would order a mobile home, Defendant would not have a buyer lined up to purchase the mobile home.  This meant that the mobile home would usually sit on Defendant's lot until a purchaser came into the dealership.  Some of these mobile homes would be available for potential purchasers to view, and some would not.  When the mobile homes sat on the dealership lot, the only protection afforded the mobile homes was the plastic sheet used to protect the mobile homes during shipping.

31

## UNIT 6161

Unit 6161 was delivered to Defendant on May 2, 2006 and was sold by Defendant on August 3, 2007. Defendant alleged various defects, and testified that those defects were the result of manufacturing errors. However, according to the invoices Defendant provided, the defects were fixed between August of 2007 and November of 2007. Based upon the length of time between the date the manufactured home was delivered and the dates when the defects were discovered and fixed, this court is not prepared to infer that the defects were present in the manufactured home upon delivery. Unit 6161 sat on Defendant's lot for at least 16 months before the first defect was fixed, and there is no telling what happened during this time period, especially considering that it was not being cooled during the hot, humid summer or heated during the winter. All of the defects set forth in the invoices could be the result of damage that the manufactured home sustained while it sat on Defendant's lot, damage that the manufactured home sustained while it was being delivered and installed, or damage that the manufactured home sustained during settling.[24] Therefore, Defendant failed to show that the defects existed at the time Unit 6161 was delivered and Defendant is not entitled to a reduction in price for Unit 6161.

## UNIT 6202

Unit 6202 was delivered to Defendant on May 24, 2006 and was sold by Defendant on March 19, 2007. Defendant alleged various defects, and testified that those defects were the result of manufacturing errors. However, according to the invoices Defendant provided, the various defects

---

[24]Defendant asserted the following defects were present in Unit 6161: wall boards that needed to be repaired, ceiling cracks that needed to be repaired, a roof and exhaust vent that needed to be repaired, carpet that needed to be re-stretched, as well as faulty wiring that needed to be replaced.

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 32 of 61

were fixed between April of 2007 and July of 2007.  Based upon the length of time between the date

the manufactured home was delivered and the dates when the defects were discovered and fixed, this

court is not prepared to infer that the defects were present in the manufactured home upon delivery.

Unit 6202 sat on Defendant's lot for at least 10 months before it was delivered to the purchaser and

the first defect was discovered and fixed, and there is no telling what happened during this time

period, especially considering that it was not being cooled during the hot, humid summer or heated

during the winter.  All of the defects set forth in the invoices could be the result of damage that the

manufactured home sustained while it sat on Defendant's lot, damage that the manufactured home

sustained while it was being delivered and installed, or damage that the manufactured home

sustained during settling.[25]  Therefore, Defendant failed to show that the defects existed at the time

Unit 6202 was delivered and Defendant is not entitled to a reduction in price for Unit 6202.

### UNIT 6298

Unit 6298 was delivered to Defendant on May 31, 2006 and was sold by Defendant on June

2, 2006.  Defendant alleged various defects, and testified that those defects were the result of

manufacturing errors, implying that the defects existed at the time of delivery.  According to the

invoices Defendant provided, the various defects were fixed between May of 2006 and September

of 2007.  Because this manufactured home did not sit on Defendant's lot for a prolonged period of

time before it was delivered to the purchaser, and the defects began to appear in the manufactured

home very close to its manufacture date, this court will infer that the defects laid out in the invoices

---

[25]Defendant asserted the following defects were present in Unit 6202: carpet that needed
to be re-stretched, fire alarms that needed to be replaced, loose wires that needed to be repaired,
ceiling cracks that needed to be repaired, wall boards that needed to be replaced, an icemaker that
needed to be repaired, and countertops that needed to be repaired.

33

did exist at the time of delivery.  Therefore, Defendant has shown that the defects existed at the time Unit 6298 was delivered and Defendant may be entitled to a reduction in price for Unit 6298.

## UNIT 6399

A Bill of Lading for Unit 6399 was not admitted into evidence so it is unclear when Unit 6399 was delivered to Defendant.  However, Unit 6399 was sold by Defendant on March 27, 2006, ordered by Defendant on April 4, 2006, and manufactured by Debtor on May 31, 2006.  Because Defendant sold the home before ordering its manufacture by Debtor, this court is comfortable with the inference that the manufactured home was delivered to the purchaser shortly after Defendant received the manufactured home from Debtor.  Defendant alleged various defects, and testified that those defects were the result of manufacturing errors, implying that the defects existed at the time of delivery.  According to the invoices Defendant provided, the various defects were fixed between June of 2006 and October of 2006.  Because this manufactured home did not sit on Defendant's lot for a prolonged period of time before it was delivered to the purchaser, and the defects began to appear in the manufactured home very close to its manufacture date, this court will infer that the defects laid out in the invoices did exist at the time of delivery.  Therefore, Defendant has shown that the defects existed at the time Unit 6399 was delivered and Defendant may be entitled to a reduction in price for Unit 6399.

Having determined that Unit 6160, Unit 6298, and Unit 6399 had defects at the time the units were delivered to Defendant, the court must examine whether Defendant has proven the last prerequisite for a cause of action in redhibition.  In addition to the requirement that any defects exist at the time of delivery, Louisiana redhibition law also requires that any defects be hidden or non-apparent:  "The seller owes no warranty for defects in the thing that were known to the buyer at the

time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things." La. Civ. Code Ann. art. 2521 (1995). Generally speaking, this means that a seller warrants that the things it sells do not have "hidden or non-apparent defects." Ollis v. Miller, 886 So. 2d 1199, 1203 (La. Ct. App. 2nd Cir. 2004). "Apparent defects are those defects that the buyer might have discovered by simple inspection, while hidden or non-apparent defects are those which cannot be discovered by simple inspection." Id. This court will examine whether the defects that existed in Unit 6160, Unit 6298, and Unit 6399 at the time of delivery were hidden and non-apparent.

The court previously noted that the allowable repairs to Unit 6160 consisted of electrical, plumbing and roof repairs. These are defects which the court finds were non-apparent at the time the unit was delivered and would not have been discovered by simple inspection.

Unit 6298 had the following defects at the time of delivery: bad siding that needed to be removed, windows and doors that needed to be re-squared, replaced and repainted, bad wiring that needed to be replaced, broken sheetrock that needed to be replaced, attic rafters that needed to be reframed, a furnace that needed to be reset, walls that needed to be repainted, ducts that needed to be repaired, and a heater that needed to be repaired. The invoices submitted by Defendant are very general in that the invoices just state what repairs were done, not the cause of the defects that needed to be repaired. With this in mind, this court finds that the following defects were apparent: broken sheetrock that needed to be replaced, and walls that needed to be repainted. This means that the following defects were non-apparent: bad wiring that needed to be replaced, attic rafters that needed to be reframed, a furnace that needed to be reset, ducts that needed to be repaired, and a heater that

35

needed to be repaired.[26]   Therefore, Defendant is entitled to a reduction in price for Unit 6298 commiserate with the non-apparent defects that existed at the time Unit 6298 was delivered to Defendant.

Unit 6399 had the following defects at the time of delivery: floors that needed to be repaired, walls that needed to be reframed, water heaters that needed to be reset, a heater compartment that needed to be reframed, broken sheetrock that needed to be replaced, walls that needed to be repainted, cabinets that needed to be repaired, water lines that needed to be repaired, broken floor tiles that needed to be replaced, and a roof that needed to be repaired at the hinge line.  The invoices submitted by Defendant are very general in that the invoices just state what repairs were done, not the cause of the defects that needed to be repaired.  With this in mind, this court finds that the following defects were apparent: floor repair.  This means that the following defects were non-apparent: walls that needed to be reframed, water heaters that needed to be reset, a heater compartment that needed to be reframed, broken sheetrock that needed to be replaced, walls that

_____

[26]This court found the broken sheetrock that needed to be replaced and walls that needed to be repainted a non-apparent defect in Unit 6399, but an apparent defect in Unit 6298.  This is true because the invoices admitted into evidence relating to Unit 6399 show that some walls in the mobile home needed to be re-framed.  It would be nearly impossible to reframe walls in such a way that sheetrock didn't need to replaced and repainted.  Because the need to reframe walls would be a non-apparent defect, this court believes that replacing the sheetrock and repainting was a secondary repair that was needed to fix a non-apparent defect, and that Defendant should be reimbursed for the secondary repair.  The court also found that these defects were non-apparent: cabinets that needed to be repaired and broken floor tile that needed to be repaired.  This is true because the invoices show that a water line needed to be repaired, and this court finds that Defendant had to repair the cabinets and floor tile either as a result of water damage or damage done while trying to repair the water line.  A non-functioning  water line is a non-apparent defect because it would not manifest until the manufactured home was hooked up to a water source.  Because the defect in the water line is a non-apparent defect, this court believes that replacing/repairing the cabinets and floor tile was a secondary repair that was needed to fix a non-apparent defect, and that Defendant should be reimbursed for the secondary repair.

needed to be repainted, cabinets that needed to be repaired, water lines that needed to be repaired, broken floor tile that needed to be replaced, and a roof that needed to be repaired at the hinge line. Therefore, Defendant is entitled to a reduction in price for Unit 6399 commiserate with the non-apparent defects that existed at the time Unit 6399 was delivered to Defendant.

This court has determined that Defendant is entitled to a price reduction for certain defects in Unit 6160, Unit 6298, and Unit 6399. Now this court must determine the extent of the price reduction to which Defendant is entitled. Defendant bears the burden of establishing the amount of the price reduction to which he is entitled. Pardue v. Ryan Chevrolet, Inc., 719 So. 2d 623, 626 (La. Ct. App. 2nd Cir. 1998). See also Dodd v. Tucker, 528 So. 2d 644, 649 (La. Ct. App. 2nd Cir. 1988) ("The purchaser has the burden of proving the amount of reduction in the purchase price with reasonable certainty."). "The proper amount of price reduction a purchaser may demand in a quanti minoris action is the difference between the actual selling price and the price a reasonable buyer and seller would have agreed upon if they had both known of the defects." Fly v. Allstar Ford Lincoln Mercury, Inc., 690 So. 2d 759, 763 (La. Ct. App. 1st Cir. 1996). "Some of the factors to consider in making an award of price reduction include the number of defects, the frequency and length of attempted repairs of the defects, the inconvenience associated with the repairs, the actual damage, if any, caused by the defects, the actual cost of repairs and the curtailed use of the thing due to its defects." Id. "A principal element in formulating the amount of the reduction in the purchase price is the cost of repairs." Id. "If the defects are few in number and quickly and simply remedied, the cost of repairs may well be the only consideration." Id.

In this case, the cost of repairs is the only consideration. Unit 6298 had the following non-apparent defects at the time of delivery which entitled Defendant to a reduction in price: bad wiring

that needed to be replaced, attic rafters that needed to be reframed, a furnace that needed to be reset, and ducts that needed to be repaired. The invoices admitted into evidence show that it cost $294.60 to replace the bad wiring, $1,356.00 to reframe the attic rafters and reset the furnace, $150.00 to do an A/C diagnostic test, $223.00 to do a State 3-RWG inspection, and $150.00 to repair the ducts. This court finds all of the invoices credible, except the invoice showing it cost $1,356.00 to reframe the attic rafters and reset the furnace. This invoice is one of a series of handwritten invoices that all appear to have been written at the same time although the invoices span a time period of over a year. The following is a chart of the handwritten invoices:

| Number of Invoice | Date of Invoice | Check Number | Unit |
|---|---|---|---|
| 718155 | 05/17/2006 | 4846 | Unit 6298 |
| 718156 | 06/30/2006 | 4942 | Unit 6298 |
| 718157 | 08/20/2006 | 5016 | Unit 6399 |
| 718158 | 08/17/2006 | 5071 | Unit 6399 |
| 718159 | 08/29/2006 | 5079 | Unit 6399 |
| 718160 | 09/22/2006 | 5142 | Unit 6399 |
| 718161 | 10/06/2006 | 5163 | Unit 6399 |
| 718162 | 12/13/2006 | 5334 | Unit 6160 |
| 718163 | 12/22/2006 | 5346 | Unit 6160 |
| 718164 | 03/6/2007 | 5468 | Unit 6160 |
| 718165 | Undated | None | Unit 6160 |
| 718166 | 04/24/2007 | 5561 | Unit 6202 |
| 718167 | 05/10/2007 | 5586 | Unit 6202 |
| 718168 | 05/30/2007 | 5613 | Unit 6202 |
| 718169 | 06/20/2007 | 5660 | Unit 6202 |

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document    Page 38 of 61

| 718170 | 07/17/2007 | 5701 | Unit 6202 |
| 718171 | 08/23/2007 | 5742 | Unit 6161 |
| 718172 | 09/13/2007 | 5785 | Unit 6161 |
| 718173 | 10/12/2007 | 5840 | Unit 6161 |

It stretches this court's imagination that Defendant was writing invoices only for the five manufactured homes at issue in this case over the course of an entire year. Although there may very well be a reasonable explanation for this, such reasonable explanation is not before this court and this court finds that the credibility of the handwritten invoices is very much in question. No copies of cancelled checks were introduced in support of these expenses. Therefore, this court declines to award Defendant a reduction in price based upon the handwritten invoices. This does not affect the computer invoices, which appear to be credible. Based upon this, the court finds that Defendant is entitled to a price reduction on Unit 6298 in the amount of $817.60: $294.60 to replace the bad wiring, $150.00 to do an A/C diagnostic test, $223.00 to do a State 3-RWG inspection, and $150.00 to repair the ducts. Therefore, Defendant owes Debtor $77,780.40 for Unit 6298, rather than $78,598.00.

Unit 6160 had the following non-apparent defects at the time of delivery which entitled Defendant to a reduction in price: repair electrical circuits, electrical repairs, repair to water line in master shower, repair roof and replace exhaust vents. The invoices admitted into evidence show that it cost $426.65 for repair of electrical circuits, $1,650.00 for electrical repairs, $334.18 for repairs to water line, $238.42 to repair roof and replace exhaust vents. The only computer invoice that was admitted into evidence for Unit 6160 was for $1,650.00 for electrical repairs. The rest of the invoices are hand written. For the reasons discussed above, this court finds that these hand written

39

invoices are not credible and declines to issue the Defendant a price reduction based upon those invoices. Therefore, the court finds that the Defendant is entitled to a price reduction on Unit 6160 in the amount $1,650.00. Therefore, Defendant owes Debtor $52,399.00 for Unit 6260, rather than $54,049.00.

Unit 6399 had the following non-apparent defects at the time of delivery which entitled Defendant to a reduction in price: walls that needed to be reframed, water heaters that needed to be reset, a heater compartment that needed to be reframed, broken sheetrock that needed to be replaced, walls that needed to be repainted, cabinets that needed to be repaired, water lines that needed to be repaired, broken floor tile that needed to be replaced, and a roof that needed to be repaired at the hinge line. The invoices admitted into evidence show that it cost $590.00 to reframe the walls, $625.00 to reset the water heater, a heater compartment that needed to be reframed, $1,589.00 to replace the broken sheetrock, $739.22 to clean for paint preparation, $2,236.00 to repaint the walls, $1,637.00 to repair the cabinets, repair the water line, and remove the broken floor tiles, and $809.00 to repair the roof at the hinge line. The only computer invoices as to non-apparent defects that were admitted into evidence for Unit 6399 were the invoices showing it cost $590.00 to reframe the walls, and cost $625.00 to reset the water heater and reframe the heater compartment. The rest of the invoices are handwritten. For the reasons discussed above, this court finds that these handwritten invoices are not credible and declines to issue Defendant a price reduction based upon those invoices. Therefore, this court finds that Defendant is entitled to a price reduction on Unit 6399 in the amount of $1,215.00: $590.00 to reframe the walls, and $625.00 to reset the water heater and reframe the heater compartment. Therefore, Defendant owes Debtor $97,230.00 for Unit 6298, rather than $98,455.00

Based upon the reduction in price for Units 6160, 6298 and 6399, Defendant owes Debtor a total of $334,956.40 for Units 6160, 6161, 6202, 6298, and 6399.

### III.  Defendant's Counterclaim - Recoupment

In addition to the damages sought for redhibition on the five manufactured homes discussed above, Defendant also seeks damages in recoupment for the following: reimbursement for the damages sought in the lawsuits that have been brought against Defendant in Louisiana; reimbursement for attorney fees; loss of revenue in the tax years 2007 and 2008; and storage costs for Unit 5020. The court will address each damage request in turn.

> Recoupment has been recognized in the bankruptcy context as an equitable doctrine which permits a creditor to reduce an obligation otherwise payable to the debtor by the amount of a claim the creditor has against the debtor.  Through the use of recoupment "a defendant [may] reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim."  Recoupment claims work as a defense to the plaintiff's claim against the defendant.

> In order to sustain a recoupment claim, a defendant must show that its claim arises from the same transaction that the plaintiff has brought before the court.  If the defendant is able to meet the same transaction requirement, then the defendant's claim can receive preference over other creditors in a bankruptcy proceeding.

Lightfoot v. Huffman (In re Brown), 325 B.R. 169, 176 (Bankr. E.D. La. 2005) (quoting U.S. Abatement Corp. v. Mobil Exploration and Producing U.S., Inc. (In re U.S. Abatement Corp.), 79 F. 3d 393, 398 (5th Cir. 1996)) (citations omitted).

> In general, courts have applied one of two main approaches in deciding whether the obligations in question satisfy the "same transaction" requirement.  To begin with, some courts have defined the requirement through use of the "logical relationship test" articulated by the Supreme Court in *Moore v. New York Cotton Exchange*, [270 U.S. 593, 610, 46 S. Ct. 367, 371, 70 L. Ed. 750 (1926)] in which the Court stated that the concept of a "'[t]ransaction' is [one] of flexible meaning.  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship."  Applying this standard, courts have permitted a variety of obligations to be recouped against each other, requiring only that the obligations be

41

sufficiently interconnected so that it would be unjust to insist that one party fulfill its obligation without requiring the same of the other party. The leading case approving this approach is the Ninth Circuit's decision in *Newberry Corp. v. Fireman's Fund Insurance Co.* [95 F. 3d 1392 (9th Cir. 1996)].

In contrast, other courts have applied the more restrictive "integrated transaction test." Under this test, the obligations in question must "arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of the transaction without also meeting its obligations." The leading case applying this approach is the Third Circuit's decision in *University Medical Center v. Sullivan (In re University Medical Center)* [973 F. 2d 1065, 1081 (3d Cir. 1992)]. Although both approaches require evaluation of whether it would be equitable to insist that one party fulfill its obligations without requiring the other party to do so, the main difference between the two lies in the degree of interconnectedness required with respect to the relevant obligations. Under the integrated transaction test, even obligations arising under a single contract may not qualify if the court concludes that they arise from "multiple transactions" under the contract. In contrast, in *Newberry*, in which the Ninth Circuit approved use of the logical relationship test, the court permitted recoupment between an obligation arising out of an indemnity agreement between the debtor and its surety and a separate rental obligation assigned to the debtor from a third party creditor that involved the same parties. Although the Ninth Circuit's decision in *Newberry* may represent the outer limits of the reach of the recoupment doctrine, the court's use of the logical relationship test represents the better approach.

4 COLLIER ON BANKRUPTCY ¶ 553.10[1]. This court could not find any Louisiana cases that addressed the requirements that must be met in order to satisfy the same transaction test for recoupment.[27] However, this court was able to find Louisiana cases that addressed the requirements that must be met in order to satisfy the same transaction test for compulsory counterclaims and for res judicata. The Louisiana law governing compulsory counterclaims provides, in pertinent part:

B. The defendant in the principal action . . . . shall assert in a reconventional demand all causes of action that he may have against the plaintiff that <u>arise out of the transaction or occurrence that is the subject matter of the principal action</u>.

LA. CODE CIV. PROC. ANN. art. 1061 (2006) (emphasis added). The Louisiana law governing res

---

[27]Because Louisiana law governs in this adversary proceeding, Louisiana law governs whether Defendant is entitled to recoup any of damages claimed. <u>See</u>, <u>e.g.</u>, <u>In re Bill Heard Enters., Inc.</u>, 400 B.R. 813, 821-22 (Bankr. N.D. Ala. 2009).

42

judicata provides, in pertinent part:

> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the <u>transaction or occurrence that is the subject matter of the litigation</u> are extinguished and merged in the judgment

> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the <u>transaction or occurrence that is the subject matter of the litigation</u> are extinguished and the judgment bars a subsequent action on those causes of action.

La. Rev. Stat. Ann. § 13:4231 (2006) (emphasis added). In Louisiana, the doctrines of recoupment, res judicata, and compulsory counterclaims have a common denominator: they only apply to causes of action that arise out of the same transaction or occurrence that gave rise to the plaintiff's cause of action. Therefore, cases interpreting the circumstances under which the doctrines of res judicata or compulsory counterclaims are applicable are illuminating as to the circumstances under which the doctrine of recoupment is applicable. After reading cases in which the doctrines of res judicata and compulsory counterclaims are discussed, this court finds that Louisiana applies the logical relationship test in determining whether causes of action arise out of the same transaction or occurrence. <u>See</u>, <u>e.g.</u>, <u>Durkin v. Quest, Inc.</u>, 724 So. 2d 868, 870-71 (La. Ct. App. 5th Cir. 1998) (Appropriate inquiry to determine whether the claims in a second suit arise out of the same transaction or occurrence upon which the claims in a previous suit were based, so as to form the basis of an exception of res judicata, is: (1) whether the issues of fact and law are the same; (2) whether substantially the same evidence will be presented; and (3) whether there is any <u>logical relationship</u> between the suits.) (emphasis added); <u>Hy-Octane Investments, Ltd. v. G & B Prods., Inc.</u>, 702 So. 2d 1057, 1060 (La. Ct. App. 3rd Cir. 1997) (stating that when "an article of the Louisiana Code of Civil Procedure is based on a federal rule, decisions of the federal courts can be

43

used for guidance" and also citing federal decisions interpreting Federal Rule of Civil Procedure 13 to help determine the definition of same transaction or occurrence; one such decision is cited for the proposition that "[a]ll logically related events entitling a person to institute legal action against another generally are regarded as comprising a 'transaction or occurrence'") (emphasis added); McDonald v. Cason, 801 So. 2d 1255, 1261 (La. Ct. App. 3rd Cir. 2001). Therefore, this court will apply the logical relationship test in determining whether the doctrine of recoupment applies to the damages asserted by Defendant in this cause of action.

In its counterclaim against Debtor, Defendant is seeking recoupment for the following: damages sought in the lawsuits that have been brought against Defendant; attorney fees; storage costs of Unit 5020; and loss of revenue in tax years 2007 and 2008.

This court will first address the request for recoupment of the damages sought in the lawsuits which have been brought against Defendant in Louisiana.[28]  These lawsuits seek damages for allegedly defective manufactured homes sold by Debtor to Defendant which Defendant then resold to consumers. Debtor argues that Defendant is not entitled to recoupment because the sale of each individual manufactured home constitutes a single contract and that each contract for the sale of a manufactured home constitutes a single transaction or occurrence; in other words, Debtor argues that no sale of a manufactured home to Defendant is related to any other sale of a manufactured home to Defendant. This court does not agree. Debtor and Defendant had a continuous, ongoing business relationship. From the testimony of Richard, which this court found credible, Debtor and Defendant were constantly negotiating about how Debtor would handle the backlog of service orders on

---

[28]These lawsuits do not involve the five manufactured homes that were discussed above in the section on redhibition.

manufactured homes that Debtor sold to Defendant.  Richard further testified that he would sometimes withhold payment until Debtor fixed all of the problems with previously ordered manufactured homes, and that Debtor frequently shipped materials to fix previously ordered manufactured homes inside the latest manufactured home that Defendant ordered.  Debtor and Defendant were in a constant cycle wherein Defendant would order manufactured homes that Debtor would manufacture and deliver, Defendant would request that Debtor make repairs, and Debtor either made the requested repairs or did not.  If Debtor did not make the repairs, Defendant would try to negotiate with Debtor on future transactions to get the needed repairs.  Based upon this continuous relationship, this court finds that the manufactured homes sold by Debtor to Defendant are all logically related to one another, that they all arise out of the same transaction, and that the doctrine of recoupment is applicable to the damages sustained by Defendant due to the alleged failure of Debtor to make necessary repairs to the homes manufactured by Debtor and sold to Defendant.  The court must now determine whether Defendant has proven such damages.

## ADAMS

Defendant seeks recoupment for the damages suffered as a result of lawsuits brought by customers who purchased manufactured homes from Defendant that were manufactured by Debtor. The first such lawsuit was brought by Mickey and Donna Adams ("the Adams").  The Adams ordered the manufacture of a home that could withstand a wind speed of 150 mph.  (Defendant's Exhibit 9B).  The Manufacturer's Data Plate for the manufactured home that was delivered to the Adams shows that such manufactured home was built to withstand a wind speed of only 90 mph.[29]

---

[29]This appears to be a common defect in the homes manufactured by Debtor: The Order Acknowledgment and Production Order specified that Unit 6160 be outfitted to withstand wind speeds of 110 mph; however, the Manufacturer's Data Plate shows that Unit 6160 was outfitted

45

(Defendant's Exhibit 9A). The Louisiana Manufactured Housing Commission fined Defendant $1,000.00 because Defendant installed a home manufactured to withstand a wind speed of 90 mph in an area that required a home manufactured to withstand a minimum wind speed of 135 to 136 mph. (Defendant's Exhibit 9A). This is clearly a fine that was levied against Defendant because Debtor failed to manufacture the home as requested, i.e., failed to manufacture the home to withstand wind speeds of 150 mph. Therefore, Defendant is entitled to recoup this $1,000.00. The only other evidence that Defendant submitted at trial was the Petition for Redhibition filed by the Adams against Defendant, and the Amended Petition for Redhibition which added Debtor as a defendant. The Petition for Redhibition is still pending and has not been resolved. The Petition and Amended Petition are only evidence of damages being sought by the Adams and not evidence of damages that Defendant might ultimately have to pay to the Adams. Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e., the improper manufacture of the home sold to the Adams. The mere filing of a Petition in Redhibition is not proof that Debtor manufactured a defective home nor is it proof that Defendant will be held liable as a result of Debtor's manufacturing of a defective home. See, e.g., Idacon, Inc. v. Arnold Constr. Co., 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success of any future litigation will necessarily

---

to withstand wind speeds of only 90 mph. (Plaintiff's Exhibits 1 & 4). The Order Acknowledgment and Production Order specified that Unit 6161 be outfitted to withstand wind speeds of 110 mph; however, the Manufacturer's Data Plate shows that Unit 6161 was outfitted to withstand wind speeds of only 90 mph. (Plaintiff's Exhibits 15 & 17). The Order Acknowledgment and Production Order did not specify that Unit 6298 be outfitted to withstand wind of any particular speed. (Plaintiff's Exhibit 38). The Order Acknowledgment and Production Order specified that Unit 6399 be outfitted to withstand wind speeds of 150 mph; however, the Manufacturer's Data Plate shows that Unit 6399 was outfitted to withstand wind speeds of only 90 mph. (Plaintiff's Exhibits 47 & 50).

depend on many contingent factors" and that "individual lawsuits are certain to generate significant issues that are not yet before this court."). Therefore, this court finds that Defendant is only entitled to recoup $1,000.00 as a result of the home manufactured by Debtor and sold to the Adams by Defendant.

## ANGONA

The second lawsuit was brought against Defendant and the Debtor by Joey and Donna Angona ("the Angonas"). On July 8, 2004, the Angonas filed a Petition for Redhibition, Breach of Contract Under the New Home Warranty Act and Damages against Defendant and Debtor in the Parish of St. Landry in Louisiana. (Defendant's Exhibit 10B). The complaint alleged the following defects: fascia improperly installed; shingles and roofing improperly installed; vinyl siding improperly installed; doors and door stops improperly installed and caulked; ceramic improperly caulked; cracks in ceiling; walls improperly caulked; crown molding improperly installed and damaged; nail holes throughout home; sink improperly caulked; drawers do not close properly; stains on flooring; ridges in flooring; window trim improperly installed and caulked; vinyl at patio doors torn; improper installation of replacement sheet rock; and other problems. Based upon these alleged defects, the Angonas alleged that the mobile home was inherently defective and sought to have the sale of the manufactured home rescinded or, in the alternative, damages. Defendant settled this lawsuit for $3,385.60 ($185.60 in court costs) and wrote a check to "Joey & Donna Angona & Thomas Dejean" in this amount. (Defendant's Exhibit 10A). The Debtor and Defendant were sued for alleged defects in the manufactured home for which the Defendant paid $3,385.60. The court finds that the Defendant can recoup this amount from the Debtor, which it paid as a result of being sued for these asserted manufacturing defects.

## ASHFORD

The third lawsuit was brought against Defendant by Kevin and Tiffany Ashford ("the Ashfords"). On September 19, 2007, the Ashfords filed a Petition for Breach of Warranty and Redhibition in the Evangeline Parish in Louisiana. (Defendant's Exhibit 11A). The complaint alleged that the mobile home was defective and sought the cost of all repairs necessary, as well as costs and attorney fees, or, in the alternative, a reduction in the purchase price, damages, costs, and attorney fees. The Petition is still pending and has not been resolved. The Petition is only evidence of damages being sought by the Ashfords and not evidence of damages that Defendant might ultimately have to pay to the Ashfords. Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e., the improper manufacture of the home sold to the Ashfords. The mere filing of a Petition in Redhibition is not proof that Debtor manufactured a defective home, nor is it proof that Defendant will be held liable as a result of Debtor's manufacturing of a defective home. See, e.g., Idacon, Inc. v. Arnold Constr. Co., 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success of any future litigation will necessarily depend on many contingent factors" and that "individual lawsuits are certain to generate significant issues that are not yet before this court."). The only other evidence of defects in the home purchased by the Ashfords' was Richard's testimony that there was extensive sheetrock damage, that there were cabinet doors missing, and that cabinets were not centered over the window when the manufactured home was delivered to Defendant's lot. In the absence of any evidence that Defendant was required to pay damages as a result of these defects and in the absence of any evidence as to what these defects would cost to repair, the presence of such defects does not entitle Defendant to recoup any money from Debtor. Therefore, this court finds that Defendant is not entitled to recoup any money

48

as a result of the lawsuit brought against it by the Ashfords.

**BONAVENTURE**

The fourth lawsuit was brought against Defendant by Robert and Mary Bonaventure ("the Bonaventures"). The lawsuit was arbitrated and the arbitrator "ordered that the items listed on the '30-Day Customer Satisfaction Inspection Report' be repaired by the [Defendant] at [Defendant's] expense within 60 days from [July 3, 2007]." (Defendant's Exhibit 12A). In addition, Defendant was ordered to pay "[t]he administrative filing and case service fees of the AAA, totaling $750.00 and the fees and expenses of the arbitrator, totaling $250.00." The 30-Day Customer Satisfaction Inspection lists numerous defects. (Defendant's Exhibit 12C). Defendant submitted evidence as to the cost of repairing the following defects: toilet doesn't flush right; toilet loose at floor; hole in paneling by bar; light fixture screws pulled out of wall; lights over fireplace don't work; tiles on sink are broken off; tiles by refrigerator crooked; drawer by oven crooked; two doors drag and are hard to close; floors scarred from refrigerator coming loose and scratching during delivery; door on cabinet by kitchen doesn't close right and big gap; no linoleum in closet; ordered desk, but got closet/flooring; toilet loose at floor; pantry door doesn't close; front door trim molding cut wrong and has two inch gap; door latch and striker bent up; bathroom door hard to close; closet in bathroom hard to close; front door when closed has gap and light comes through; door doesn't close right to closet; some windows only open a quarter of the way; closet door hard to open; hump in floor from kitchen to hallway; water connection to sink was leaking in floor; deep staple holes by toilet on left and behind; molding by shower has big gap because strip of paneling was run under it; tiles loose at cabinet and sink; molding by shower has big gap because strip of paneling was run under it; tiles loose at cabinet and sink; broken vent on skirting on left side; big nail holes in wall by light switch;

49

skirting around bottom by back door lumped and bulged out; pantry door molding gouged from refrigerator coming loose from wall during shipment.  (Defendant's Exhibit 12B).  Defendant estimates that it would cost the following to repair these alleged defects: $5,113.00 for labor and $1,075.00 for parts.  (Defendant's Exhibit 12B).[30]  It appears that the manufactured home was delivered to the Bonaventures around May 31, 2006[31] and the form was filled out around June 5, 2006.  The close proximity of the delivery date to the date that the form was filled out indicates to this court that these defects listed on the form existed at the time Defendant delivered the manufactured home to the Bonaventures.  The Defendant was ordered to repair these defects by the arbitrator.  Defendant presented evidence that the cost to make these repairs, including parts, would be $6,188.00.  Defendant was also ordered to pay $1,000.00 for the arbitration fees and expenses for a total of $7,188.00.  Therefore, this court finds that the Defendant is entitled to recoup $7,188.00 as a result of the arbitration award in favor of the Bonaventures.

## DAUSSAT

The fifth lawsuit was brought against Defendant by Dennis Daussat, Jr. ("Daussat").  On October 17, 2006, Daussat, filed a Petition for Damages, Rescission, and/or Redhibition, Quanti Minoris, and Attorney Fees, and/or Specific Performance Under Warranty/Contract in St. Landry Parish, Louisiana.  (Defendant's Exhibit 13A).  The suit alleged numerous defects including electrical problems; window defects; ceiling defects; carpet defects; interior and exterior trim defects; floor and flooring defects; cabinet and counter defects; wall defects; skirting defects; tile

---

[30]Danny Richard testified that the largest expenditures for the repairs were caused by the fact that the refrigerator was not properly secured.

[31]This is shown on the 30-Day Customer Satisfaction Inspection Report as the "Close Date or the Date Ownership Changed to Customer from Royal."  (Defendant's Exhibit 12C).

defects; paint defects; door defects; improper setup problems and plumbing problems; as well as additional non-apparent defects. The complaint also alleged that the installation and setup of the mobile home was done negligently. Daussat sought the rescission of the sale of the mobile home or, in the alternative, a reduction in the purchase price. In addition to the defects alleged in the complaint, the water heater also needed to be replaced. Defendant submitted two receipts detailing the replacement of the water heater: the water heater cost $478.84 and the installation of the water heater cost $150.00. (Defendant's Exhibit 13B). The receipts indicate that this water heater replacement occurred in December of 2008. The complaint alleges the mobile home was purchased in February, 2006. Richard testified that he noticed cabinet defects, the windows were extremely hard to open and close, the doors were way out of square, and that there was a mold issue caused by water coming in at the hinge line. Richard further testified that water was a result of an improperly installed roof which would be a manufacturer's defect. The Petition for Redhibition is still pending and has not been resolved. The Petition is only evidence of damages being sought by Daussat and not evidence of damages that Defendant might ultimately have to pay to Daussat. Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e., the improper manufacture of the home sold to Daussat. The mere filing of a Petition in Redhibition is not proof that Debtor manufactured a defective home nor is it proof that Defendant will be held liable as a result of Debtor's manufacturing of a defective home. See, e.g., Idacon, Inc. v. Arnold Constr. Co., 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success of any future litigation will necessarily depend on many contingent factors" and that "individual lawsuits are certain to generate significant issues that are not yet before this court."). In the absence of any evidence that Debtor's conduct is the reason that Defendant might have to repair the defects in the manufactured

home, Defendant is not entitled to recoup the cost of such repairs. Finally, the testimony of Richard is not evidence that Defendant is entitled to recoupment because Richard did not testify about the cost to repair the alleged manufacturing defects. The only evidence submitted which details the amount to which Defendant might be entitled to recoup is the invoices relating to the purchase and replacement of a water heater. (Defendant's Exhibit 13B). However, there is almost a three-year period between the time the manufactured home was purchased by Daussat and the time that he ordered the replacement water heater.[32] Based upon this time-lag, this court is not comfortable finding that the need to replace the water heater was the result of a manufacturer's defect. In the absence of a finding that the water heater needed to be replaced as the result of the conduct of Debtor, Defendant is not entitled to recoup the cost to replace and install the water heater. Therefore, this court finds that Defendant is not entitled to recoup any money as a result of the lawsuit brought against it by Daussat.

## DARBONNE

The sixth lawsuit was brought against Defendant by James Dolan Darbonne ("Darbonne"). On October 20, 2006, Darbonne filed a Petition for Damages in St. Landry Parish, Louisiana. The suit alleged defects and seeks damages not to exceed $50,000.00. (Defendant's Exhibit 14A). Richard testified that there were issues with the roof at the hinge line caused by improper installation of the roof by the manufacturer. Richard also testified that a lot of materials were missing from the home so that the home could not be finished after the two halves of the manufactured home were put together. The Petition is still pending. The Petition is only evidence of damages being sought by

---

[32]The Petition alleges that Daussat purchased the manufactured home from Defendant on February 22, 2006. (Defendant's Exhibit 13A). The invoices submitted into evidence show that the replacement water heater was purchased on December 17, 2008.

Darbonne and not evidence of damages that Defendant might ultimately have to pay to Darbonne.

Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e.,

the improper manufacture of the home sold to Darbonne. The mere filing of a Petition in

Redhibition is not proof that Debtor manufactured a defective home, nor is it proof that Defendant

will be held liable as a result of Debtor's manufacturing of a defective home. See, e.g., Idacon, Inc.

v. Arnold Constr. Co., 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success

of any future litigation will necessarily depend on many contingent factors" and that "individual

lawsuits are certain to generate significant issues that are not yet before this court."). The testimony

of Richard is not evidence that Defendant is entitled to recoupment because Richard did not testify

about the cost to repair the alleged manufacturing defects. Therefore, this court finds that Defendant

is not entitled to recoup any money as a result of the lawsuit brought against it by Darbonne.

### EASTERLING

The seventh lawsuit was brought against Debtors Chad and Lisa Easterling ("the

Easterlings"). The Auto Fraud Unit of the Attorney General's Office of Louisiana sent Defendant

a letter on February 8, 2007 informing Defendant that the Easterlings had filed a complaint with its

office. (Defendant's Exhibit 15A). On December 20, 2005, the Easterlings filed a Suit for

Redhibition and Damages against Defendant in the Parish of Avoyelles in Louisiana. (Defendant's

Exhibit 15D). The suit alleged that the manufactured home "exhibited water leaks and the trapping

of excessive amounts of condensation in the interior wall, caused, upon information and belief, by

improperly caulked ceiling light fixtures, holes in vent ducts, and improperly vented air conditioning

coiling, causing the growth of toxic mold and causing the air conditioner unit to run excessively."

The suit also alleged that the set up of the mobile home was improperly and negligently conducted.

53

The Easterlings sought the reimbursement of all damages sustained. The Suit for Redhibition was dismissed on June 30, 2010 and the Easterlings were ordered to pay $4,806.00 in jury costs, and also taxed with all costs associated with the Suit for Redhibition. (Plaintiff's Exhibit 72). There is no evidence as to why the case was dismissed; there is no evidence as to whether Defendant incurred costs fixing the home; and there is no evidence as to whether manufacturing defects in the home caused Defendant to incur costs fixing the home. Therefore, this court finds that Defendant is not entitled to recoup any money as a result of the Suit for Redhibition filed by the Easterlings.

### MONCEAUX

The eighth claim brought against Defendant was filed by Leonard Monceaux ("Monceaux"). The Louisiana Manufactured Housing Commission sent Defendant a letter, dated May 3, 2006, informing Defendant that Monceaux sent the commission a consumer complaint which contained allegations that might violate the Federal Manufactured Home Construction and Safety Standards. (Defendant's Exhibit 16). The complaint filed with the commission alleged: cracks in walls, lumps in floors, dining room window is installed crooked and leaks when it rains, carpets were installed improperly, cracks in ceiling which were repaired poorly, skirting is falling off because it was installed poorly, siding is very warped, marriage point was done poorly, floor and ceiling molding do not match evenly, and hallway and one bedroom have the wrong color carpet. (Defendant's Exhibit 16). The letter received by the Defendant from the Louisiana Manufacturing Housing Commission is the only evidence of damages being sought by Monceaux and not evidence of damages that Defendant might ultimately have to pay to Monceaux. Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e., the improper manufacture of the home sold to Monceaux. This letter is not proof that Debtor manufactured a defective home

54

nor is it proof that Defendant will be held liable as a result of Debtor's manufacturing of a defective home. There was no evidence that any lawsuits had been filed since this May, 2006 letter. <u>See</u>, <u>e.g.</u>, <u>Idacon, Inc. v. Arnold Constr. Co.</u>, 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success of any future litigation will necessarily depend on many contingent factors" and that "individual lawsuits are certain to generate significant issues that are not yet before this court."). The only other evidence is Richard's testimony that there were numerous problems with the manufactured home: lumps in the floor, the windows were crooked, the carpet was not installed properly, there were ceiling cracks, the skirting fell off, the marriage point was done poorly, and the wrong color carpet was installed in two rooms. In the absence of any evidence as to what these defects would cost to repair, the presence of such defects does not entitle Defendant to recoup any money from Debtor. Therefore, this court finds that Defendant is not entitled to recoup any money as a result of the consumer complaint brought against it by Monceaux.

## POWERS

The ninth lawsuit was brought against Defendant by Jerry Eugene Powers and the Estate of Ethel Elaine Powers ("the Powers"). The Powers filed a Suit in Redhibition against Defendant alleging numerous defects with the home seeking rescission of the sale of the manufactured home in Evangeline Parish, Louisiana. (Defendant's Exhibit 17A). The Powers were also a party to an arbitration wherein they were awarded $45,000.00 plus costs. (Defendant's Exhibit 17D). However, this arbitration award was vacated and the proceedings were remanded to the trial court. (Defendant's Exhibit 17H). Defendant submitted a form showing all the alleged problems in the Powers' manufactured home. (Defendant's Exhibit 17I). To fix these alleged problems would cost $6,780.00 in labor and $4,598.00 in parts. (Defendant's Exhibit 17I). The Suit in Redhibition is still

55

pending. The Suit is only evidence of damages being sought by the Powers and not evidence of damages that Defendant might ultimately have to pay to the Powers. Defendant would only be entitled to recover damages sustained as a result of Debtor's actions, i.e., the improper manufacture of the home sold to the Powers. The mere filing of a Petition in Redhibition is not proof that Debtor manufactured a defective home, nor is it proof that Defendant will be held liable as a result of Debtor's manufacturing of a defective home. See, e.g., Idacon, Inc. v. Arnold Constr. Co., 537 So. 2d 1290, 1296 (La. Ct. App. 2nd Cir. 1989) (stating that "the success of any future litigation will necessarily depend on many contingent factors" and that "individual lawsuits are certain to generate significant issues that are not yet before this court."). The only other evidence was Richard's testimony that there were problems with the walls, floor, doors, cabinets, roof, and siding.[33] This court is not inclined to grant the request for recoupment based upon the form submitted by Defendant. First, the Suit in Redhibition claims that the Powers bought the manufactured home from Defendant on November 14, 2005. The form submitted by Defendant is dated June 5, 2007. There is almost a two-year time-lag between the time the Powers purchased the manufactured home and the time the form listing the alleged defects was compiled; in addition, there is no indication as to when the manufactured home was delivered to Defendant's lot. Based upon this time-lag, this court is not comfortable finding that the defects listed in the form are in actuality manufacturer's defects. In the absence of a finding that the defects are manufacturer's defects, Defendant is not entitled to recoup the cost to repair the defects. This court is not inclined to grant the request for recoupment based upon the testimony of Defendant that there defects at the time the manufactured home was

---

[33]Defendant also submitted into evidence an arbitration award, but this award is not relevant because it was later vacated. (Defendant's Exhibit H & I).

delivered to Defendant's lot either.  In the absence of any evidence that Defendant was required to pay damages as a result of these defects, the presence of such defects does not entitle Defendant to recoup any money from Debtor.  Therefore, this court finds that Defendant is not entitled to recoup any money as a result of the lawsuit brought against it by the Powers.

The Defendant is entitled to recoup $1,000.00 for the Adams claim, $3,385.60 for the Angona claim, and $7,188.00 for the Bonaventure claim, for a total of $11,573.60.

## ATTORNEY FEES

In addition to seeking recoupment for the damages sustained in the claims brought against it by various claimants, Defendant also seeks recoupment for the attorney fees it has incurred in defending against such claims.[34]  While this court agrees that Defendant would be entitled to recoup any attorney fees incurred to defend against manufacturing defects that were caused by Debtor, this court does not agree that Defendant has proven such attorney fees.   The Defendant offered Defendant's Exhibit 8, a copy of an affidavit and fee itemization from the law firm of Morrow, Morrow, Ryan and Bassett, the Defendant's attorneys in Louisiana.  The Debtor objected to the admission of this affidavit and attachments, which the court sustained.   Therefore, there is no evidence in the record upon which to award attorney fees.  Therefore, this court finds that Defendant is not entitled to recoup any attorney fees.

## STORAGE

Defendant also seeks recoupment for the transportation and storage costs for Unit 5020.

---

[34]Defendant also seeks recoupment of the attorney fees paid to counsel in this adversary proceeding in the amount of $16,500.00.  Defendant is not entitled to recoup these attorney fees as they were not incurred while defending a suit brought due to a manufacturing defect in a home manufactured by the Debtor.  Instead, these attorney fees were incurred because the Defendant did not pay for the manufactured homes that it ordered from Debtor.

57

Defendant did not purchase Unit 5020 from Debtor; Debtor manufactured Unit 5020 for another dealer in Louisiana, but asked to Debtor to pick it up when it became distressed. Defendant complied with the request, and it has been stored by Defendant ever since. The parties disagree over why Unit 5020 remained on Defendant's lot for so long: Debtor asserts that Defendant would not let Debtor come pick it up; Defendant denies this and says the manufactured home was only fit for salvage. Because this manufactured home was not one ordered by Defendant, the analysis of whether this transaction qualifies as part of the "same transaction" is different than the analysis above; therefore, it is not clear whether any costs associated with storing the manufactured home would qualify for recoupment. This court will not address this issue, however, because Defendant failed to introduce any evidence of the costs incurred in picking up Unit 5020 and storing it. Defendant seeks $6,000.00 in transportation costs, which consisted of two trips to pick up the home because it had broken apart from being waterlogged. No invoice was sent to Debtor for the cost of moving the manufactured home from the site to Defendant's lot, there was no evidence that the parties had agreed what the cost to pick up the mobile home would be or how the cost would be calculated, and Defendant introduced no other evidence showing how it arrived at a cost of $6,000.00 for these two trips. Defendant also seeks $10,950.00 in storage costs, which consist of a charge of $15.00 per day for two years. No invoice was sent to Debtor for the storage costs associated with Unit 5020, there was no evidence the parties agreed to a storage fee or how a storage fee would be calculated, and Defendant introduced no other evidence detailing how the $15.00 per day charge was calculated. Therefore, Defendant is not entitled to recoup any transportation or storage costs for Unit 5020.

Case 08-70007-CMS    Doc 57    Filed 08/18/11    Entered 08/18/11 12:59:37    Desc Main
Document      Page 58 of 61

## LOST PROFITS

Defendant also seeks recoupment for its loss of profits for the years 2007 and 2008. This court agrees that Defendant would be entitled to recoup any loss in profits if Defendant could prove that such loss in profits was the result of the presence of manufacturing defects in the manufactured homes built by Debtor. However, Defendant has failed to provide such proof. Lost profits must be proven with "reasonable certainty" and will not be awarded when they are "purely conjectural." Koncinsky v. Smith, 390 So. 2d 1377, 1383 (La. Ct. App. 3rd Cir. 1980). In support of its assertion that Debtor's failure to repair manufacturing defects caused a loss of profits, Defendant submitted its tax returns for the year 2006, 2007, and 2008. In 2006, Defendant had gross receipts of $3.25 million and gross profit of $632,188.00; in 2007, Defendant had gross receipts of $895,339.00 and gross profit of $252,056.00; in 2008, Defendant had gross receipts of $857,386.00 and gross profit of $108,386.00. Richard testified that the problems with Debtor's servicing of defective manufactured homes arose in 2006, and that the drop in profit from 2006 to 2007 and 2008 was a result of Debtor's failure to service the manufactured homes. As further proof that Debtor caused Defendant's financial problems, Richard testified that the market for manufactured homes in Louisiana, rose sharply in 2007 due to housing shortages after Hurricane Katrina and that Defendant should have seen an increase in sales and profits during 2007 and 2008, not a decrease. This court finds that evidence submitted is not sufficient to prove lost profits with a "reasonable certainty" because there are too many other reasons why Defendant could have seen a reduction in profits; particularly, the housing and financial crisis that swept throughout the country in 2008. In short, this court is not willing to award lost profits solely on the basis of a decrease in revenues and a general assertion that mobile home revenues increased in Louisiana over this same time period; this is not

59

enough to prove lost profits were caused by Debtor's failure to service the defective manufactured homes. Therefore, Defendant is not entitled to recoup any lost profits from Debtor.

Defendant is entitled to recoup $11,573.60, bringing the total amount owed to Debtor down to $323,382.80.

## CONCLUSION

Trustee commenced this adversary proceeding to recover the purchase price of six manufactured homes that Debtor manufactured: $54,049.00 for Unit 6160; $53,331.00 for Unit 6161; $54,216.00 for Unit 6202; $78,598.00 for Unit 6298; $98,445.00 for Unit 6399; and $70,074.00 for Unit 5020. Trustee is entitled to recover the purchase price of all units, except Unit 5020, as Defendant ordered, received delivery, and resold all units except Unit 5020. Therefore, Trustee proved that the entry of a judgment of $338,639.00 against Defendant was warranted. Defendant counterclaimed, seeking a reduction in the purchase price of Units 6160, 6161, 6202, 6298, and 6399 pursuant to the Louisiana cause of action title redhibition. Defendant proved that it was entitled to a reduction in the purchase price of Unit 6160 in the amount of $1,650.00, reducing the purchase price of Unit 6160 to $52,399.00. Defendant proved it was entitled to a reduction in the purchase price of Unit 6298 in the amount of $817.60, reducing the purchase price of Unit 6298 to $77,780.40. Defendant also proved it was entitled to a reduction in the purchase price of Unit 6399 in the amount of $1,215.00, reducing the purchase price to $97,230.00. The reduction in the purchase price of these three units reduces the amount of the judgment against Defendant to $334,956.40. Defendant also counterclaimed seeking recoupment of various expenses. Defendant proved it was entitled to recoup $11,573.60, reducing the amount of the judgment Trustee is entitled to down to $323,382.80. Therefore, this court will enter judgment in Trustee's favor, against

60

Defendant, in the amount of $323,382.80.

**DONE and ORDERED** this August 18, 2011.

/s/ C. Michael Stilson
C. Michael Stilson
United States Bankruptcy Judge

61